**IN THE CIRCUIT COURT OF THE STATE OF OREGON**

**FOR THE COUNTY OF WASHINGTON**

| | |
|---|---|
| **JOEL GROSHONG,** an individual, | Case No. 23CV34905 |
| Plaintiff, | |
| v. | **COMPLAINT** |
| **MTGLQ INVESTORS, L.P.**, a Delaware Limited Partnership, **RUSHMORE LOAN MANAGEMENT SERVICES LLC**, a foreign Limited Liability Corporation, and **JOHN DOES 1-5,** | 1. Declaratory Judgment |
| | FEE AUTHORITY: ORS 21.160(1)(c) |
| | **NOT SUBJECT TO MANDATORY ARBITRATION** |
| Defendants. | |

Plaintiff, Joel Groshong ("Groshong"), as an individual, alleges as follows:

1.

This is a foreclosure case. It is an action by Groshong to halt the sale of his house by a *nonjudicial foreclosure*.

2.

MTGLQ Investors, L.P. ("MTGLQ") is a Delaware Limited Partnership Company.

//

**Page 1 – COMPLAINT**

SCANNELLAW, LLC
7307 SW Beveland St. Ste 200
Tigard, Oregon 97223

EXHIBIT 1
Page 1 of 100

1

3.

2       Rushmore Loan Management Services LLC ("Rushmore") is a foreign limited liability

3   corporation registered to do business in the State of Oregon.

4

4.

5       John Does 1-5 are unknown individuals or entities to Plaintiff who are either in privity

6   with the named Defendants, or who are the disclosed or undisclosed principals of the named

7   Defendants, and who purported to be the prior beneficiaries of the Loan as described in

8   paragraph 7 below.

9

5.

10       Venue is proper, as the real property (the "Property") that is the subject of this litigation

11  is in Washington, County, at the commonly known address of 2335 Sunset Drive, Forest Grove,

12  Oregon 97116, and is legally described on the Trustee's Notice of Sale, dated August 26, 2022,

13  as a parcel of land situated in the William B. Stokes Donation Land Claim No. 61, in Section 31,

14  Township 1 North, Range 3 West.  A true and correct copy of the Notice of Sale is attached to

15  this Complaint as Exhibit 1 and is incorporated by reference herein.

16

6.

17       At all material times herein, Groshong was and is the fee simple owner of the Property.

18

7.

19       On or about January 24, 2002, Groshong executed a Note and Deed of Trust ("DOT")

20  (the "Loan") on the Property.  A true and correct copy of the Note and DOT are attached to this

21  Complaint as Exhibit 2 and are incorporated by reference herein.

22

8.

23       Since September 1, 2017, Rushmore has asserted that it is the loan servicer of the Loan.

24

**Page 2 – COMPLAINT**

9.

A public sale of the Property has been scheduled for September 19, 2023.

**INTRODUCTION**

10.

It is more likely than not that the party asserting the right to foreclose, MTGLQ, is not the proper party and has no standing to engage in a nonjudicial foreclosure. Under Oregon law there is only one party who can engage in a nonjudicial foreclosure, the beneficiary. MTGLQ is not the beneficiary of the loan. In addition, the substitute trustee attempting to conduct the foreclosure was not appointed by the beneficiary and therefore had no authority to act.

11.

Groshong also asserts that the statute of limitations has run on any claim that any of the purported proper parties had to bring a foreclosure. Before, *Deutsche Bank Tr. Co. Americas v. Walmsley*, 277 Or App 690, 695, 374 P3d 937, 939 (2016), the UCC had nothing to do with foreclosures in Oregon. The more specific statute of the Oregon Trust Deed Act ("OTDA") was the only legal basis for a nonjudicial foreclosure. After *Walmsley* found that the UCC controls foreclosures in Oregon, the Oregon courts have not considered the implications of the case on the statute of limitations in foreclosure cases. ORS 73.0118, UCC 3-118, establishes the statute of limitations is six-years under these circumstances. The foreclosure the Defendants seek to conduct is one in which the payments on the Loan have not been made since 2008.

12.

Groshong also seeks to get an accurate reinstatement amount for this loan as required under ORS 86.778. This is more than an academic question; Groshong has the means to pay.

//

**Page 3 – COMPLAINT**

13.

The issue for this Court, among others is do banks have to follow the law when they seek to conduct a non-judicial foreclosure to dispossess people of their homes?

**FACTS**

A. *Relevant Provisions of DOT*

14.

Starting on or about September 25, 2008, JP Morgan Chase ("Chase") asserted that it became the Loan servicer on behalf of the Federal National Mortgage Association ("Fannie Mae"), who on information and belief, may have been for a period of time the custodian of the Loan.

15.

Section 16 of the DOT states in part as follows:

> "Governing Law; Severability; Rules of Construction. *This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property Is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law.* Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision." (Emphasis added).

16.

Section 19 of the DOT states, in part:

> "Borrower's Right to Reinstate After Acceleration. Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument..." if borrower "*cures any default.*" (Emphasis added).

//

**Page 4 – COMPLAINT**

17.

Section 22 of the DOT states, in part:

>  that any notice of acceleration "shall further inform Borrower of the right to reinstate after acceleration and *the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale.*" (Emphasis added).

### B. The Loan is Sold After Origination

18.

On or about January 24, 2002, the Loan was purportedly sold by the loan originator to Washington Mutual Bank, FA ("WaMu").  Prior to its collapse in 2008, WaMu was the largest savings and loan bank in the United States of America.

19.

The Loan is, and at all relevant times was, a Fannie Mae loan.  Fannie Mae is a government-sponsored enterprise ("GSE").  The Loan was purchased from the loan originator directly or indirectly by Fannie Mae shortly after the Loan was funded, and then the Loan was securitized by Fannie Mae.

20.

A GSE is a type of financial services corporation created by the United States Congress. Their intended function is to enhance the flow of credit to targeted sectors of the economy, to make those segments of the capital market more efficient, and to reduce the risk to investors and other suppliers of capital.  The GSE's have been found to be instrumentalities of the federal government.

//

//

//

**Page 5 – COMPLAINT**

SCANNELLAW, LLC
7307 SW Beveland St. Ste 200
Tigard, Oregon 97223

**EXHIBIT 1**
**Page 5 of 100**

*C.  The Assets of Fannie Mae, Including this Loan are Taken Over by FHFA*

21.

On or about September 7, 2008, Fannie Mae was placed under the Federal Home Finance

Agency's ("FHFA") conservatorship, and as such FHFA immediately succeeded to all rights in

Fannie Mae's assets. *See* 12 U.S.C. § 4617(b)(2)(A)(i).  As a result, FHFA now and at all

relevant times holds the rights to that first Note and the DOT of the Loan – an asset of Fannie

Mae.

22.

Fannie Mae remains in the conservatorship as of the time this Complaint was filed.

23.

The FHFA was established by the Housing and Economic Recovery Act of 2008 and is

responsible for the effective supervision, regulation, and housing mission oversight of Fannie

Mae, the Federal Home Loan Mortgage Corporation (Freddie Mac), and the Federal Home Loan

Bank System, which includes the 11 Federal Home Loan Banks, and the Office of Finance.

Since 2008, FHFA has also served as conservator of Fannie Mae and Freddie Mac.

24.

At the time the conservatorship was imposed, the combined GSE losses of $14.9 billion

and market concerns about their ability to raise capital and debt threatened to disrupt the U.S.

housing finance market.  The Treasury committed to invest as much as $200 billion in preferred

stock and extended credit through 2009 to keep the GSEs solvent and operating.  The two GSEs

(Fannie Mae and Freddie Mac) had more than $5 trillion in mortgage-backed securities and debt

outstanding; the debt portion alone was $1.6 trillion.

//

**Page 6 – COMPLAINT**

SCANNELLAW, LLC
7307 SW Beveland St. Ste 200
Tigard, Oregon 97223

EXHIBIT 1
Page 6 of 100

25.

On Thursday, September 25, 2008, the United States Office of Thrift Supervision ("OTS") seized WaMu's banking operations and placed it into receivership with the Federal Deposit Insurance Corporation ("FDIC"). The OTS took the action due to the withdrawal of $16.7 billion in deposits during a 9-day bank run (amounting to 9% of the deposits it had held on June 30, 2008).

26.

On September 25, 2008, the FDIC sold the assets of WaMu to Chase for $1.9 billion. In theory, that would have included the Loan. However, this Loan was not sold to Chase, as it was not an asset of WaMu on September 25, 2008. It remained an asset of the FHFA.

27.

On January 7, 2009, Chase caused a "Substitution of Trustee" to be filed in the property records of Washington County. A true and correct copy of that document is attached to this Complaint as Exhibit 3 and is incorporated by reference herein. The document purports to name local attorney Kelly D. Sutherland of Shapiro & Sutherland, LLC as the new trustee.

28.

The "Substitution of Trustee" described in paragraph 27 was signed on behalf of JPMorgan Chase Bank, National Association "successor in interest to Washington Mutual Bank by operation of law." The individual who signed the documents on behalf of Chase was Liquenda Allotey.

//

//

//

**Page 7 – COMPLAINT**

29.

It is well established in case law throughout the country that Liquenda Allotey was a prodigious "robo-signer" and likely "signed" tens of thousands, if not hundreds of thousands, of mortgage documents on behalf of not only Chase, but also the Mortgage Electronic Registration System, or MERS.

30.

The Substitution of Trustee described in paragraphs 27 through 29 was void at the time it was filed, as neither Chase nor WaMu were the beneficiaries of the loan and did not have the authority to make the substitution. For this reason, any subsequent actions by any other "trustees" are also void.

31.

On or about September 29, 2010, Chase suspended all its active foreclosures to examine the issue of whether or not it had been filing defective documents with Courts throughout the country to foreclose on residential properties.

32.

On or about April 11, 2011, Chase entered into a consent decree (the "Decree") with its regulator, the Board of Governors of the Federal Reserve System, Docket No 11-023-B-HC, and 11-023-B-DEO. A true and correct copy of the consent decree is attached as Exhibit 4 and is incorporated by reference herein.

33.

The Decree described in paragraph 32 documents that Chase was a servicer for the GSEs. The Decree goes on to document that from the period January 1, 2009, to December 31, 2010, it was alleged that Chase:

**Page 8 – COMPLAINT**

"(a) Filed or caused to be filed in state courts and in connection with bankruptcy proceedings in federal courts numerous affidavits executed by employees of the Mortgage Servicing Companies or employees of third-party providers making various assertions, such as the ownership of the mortgage note and mortgage, the amount of principal and interest due, and the fees and expenses chargeable to the borrower, in which the affiant represented that the assertions in the affidavit were made based on personal knowledge or based on a review by the affiant of the relevant books and records, when, in many cases, they were not based on such knowledge or review; (b) including those not signed or affirmed in the presence of a notary; and (c) Litigated foreclosure and bankruptcy proceedings and initiated non-judicial foreclosures without always confirming that documentation of ownership was in order at the appropriate time, including confirming that the promissory note and mortgage document were properly endorsed or assigned and, if necessary, in the possession of the appropriate party" Ex. 4, at 2-3.

34.

Groshong does not seek to enforce the Decree, nor does he seek any benefit from the alleged assignment of the Loan documented in paragraph 18.  What he does seek is to demonstrate to the Court that the Party or Parties who now seek to foreclose on his property have engaged in a series of actions to generate documents that make it appear they have a right to foreclose, when in fact they do not.

35.

On or about June 20, 2011, Groshong filed for Chapter 11 bankruptcy.  The Property was one of the assets of the bankruptcy estate.

36.

On or about April 5, 2012, Chase filed for relief from stay on the Loan and other loans. A true and correct copy of Chase's Motion for Relief From Stay is attached as Exhibit 5 and is incorporated by reference herein.  In its filings, Chase admitted the Loan was a Fannie Mae loan and that "WAMU FA assigned all the beneficial interests in [the Loan] to Fannie Mae with

**Page 9 – COMPLAINT**

1  Fannie Mae, and in turn, retaining WAMU FA, and or its affiliates, to actually service and

2  collect upon the [the Loan]." Ex. 5, at 10.

3                                    37.

4        No action was ever taken on this Motion by Chase.

5                                    38.

6        On or about March 3, 2013, Chase and the FDIC caused to be filed in the property

7  records of Washington County, a document that purports to be a "Corporate Assignment Of

8  Deed Of Trust" for this Loan.  A true and correct copy of the Assignment is attached to this

9  Complaint as Exhibit 6 and is incorporated by reference.

10                                   39.

11       At the time this assignment was made, neither the FDIC nor Chase had any rights in the

12  Loan.  The FDIC claimed to have "sold" the assets of WaMu to Chase on September 25, 2008.

13                                   40.

14       In fact, the FDIC never had any rights in the Loan as the Loan had been taken over by the

15  FHFA on September 7, 2008, when it put Fannie Mae in a receivership.

16                                   41.

17       Almost five years after filing its first Motion for Relief From Stay, Chase filed a second

18  Motion for Relief From Stay on January 31, 2017.  A true and correct copy of Chase's second

19  Motion for Relief From Stay is attached as Exhibit 7 and is incorporated by reference herein.

20  That motion omitted many of the admissions relating to title from the previous motion.  The

21  second motion did assert that Chase "services the loan" and that Chase "directly or through an

22  agent, has possession of the promissory note.  The promissory note is either made payable to said

23  entity [Chase] or has been duly endorsed." Ex. 7, at III.

24

**Page 10 – COMPLAINT**

42.

The allegations in the second Motion for Relief From Stay were and are false.

43.

On or about February 6. 2017, Groshong's bankruptcy counsel answered and denied that Chase had a right to service the Loan or that they had the promissory note.  Counsel for Groshong "demanded strict proof" of the assertions in Chase's Motion for Relief.

44.

On or about May 25, 2017, without further argument, the parties agreed to a 30-day abatement of the motion to allow Chase to present the Court with the documents needed to prove it had the standing it asserted in open Court.  At the end of the 30 days Chase took no action.

45.

On or about July 5, 2017, Chase withdrew the second Motion for Relief From Stay and its motion was dismissed by the Court without prejudice.

46.

At no time in the bankruptcy proceeding did Chase come forward with any proof of its assertions relating to the Loan

47.

On or about August 21, 2017, Chase purported to assign the DOT to MTGLQ.  This assignment is without any legal basis.  On that date, Chase had no interest in the Loan and could not assign any legal rights to MTGLQ.  A true and correct copy of the Assignment of Deed of Trust is attached as Exhibit 8 and incorporated by reference herein.

//

//

**Page 11 – COMPLAINT**

SCANNELLAW, LLC
7307 SW Beveland St. Ste 200
Tigard, Oregon 97223

**EXHIBIT 1**
**Page 11 of 100**

48.

On or about August 19, 2022, the entity that purports to be the trustee issued a Notice of Default and Election to Sell the Property.  This notice is void as this trustee does not have the authority to act.  A true and correct copy of the Notice of Default and Election to Sell is attached as Exhibit 9 and incorporated by reference herein.

49.

On information and belief, none of the entities seeking to foreclose have possession of the Note.

**CLAIM FOR RELIEF**

**(Declaratory Judgment ORS 28.010, ORS 28.020, and 28.080 – Against all Defendants)**

50.

Paragraphs 1 to 49 are hereby incorporated by reference as if set forth in full herein.

51.

Under ORS 28.010, "Courts of record within their respective jurisdictions shall have power to declare rights, status, and other legal relations, whether or not further relief is or could be claimed.  No action or proceeding shall be open to objection on the ground that a declaratory judgment is prayed for.  The declaration may be either affirmative or negative in form and effect, and such declarations shall have the force and effect of a judgment."

52.

Pursuant to the Note and DOT, Groshong has substantial legal right in the Property that is at issue in this litigation.  The Defendants threaten those rights as set forth in paragraphs 3, and 29-32.  The rights and obligations of the parties can be adjudicated by this Court declaring the rights and obligations of the parties herein.

**Page 12 – COMPLAINT**

SCANNELLAW, LLC
7307 SW Beveland St. Ste 200
Tigard, Oregon 97223

**EXHIBIT 1**
**Page 12 of 100**

53.

Groshong therefore requests that the Court declare the rights and obligations of the parties under the DOT, the Note, and any modifications to those agreements pursuant to the OTDA.

54.

Groshong specifically requests that the Court declare:

a) The amount needed to reinstate his Loan as is required by law;

b) That MTGLQ is not the beneficiary of the Note and therefore may not conduct a non-judicial foreclosure of this property under the OTDA; and

c) for any other relief the Court finds right and just.

## I.    PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays for relief as follows on his claims:

1. On Plaintiff's Claim for Relief, a declaratory judgment declaring the rights and obligations of the parties under the DOT, the Note, any modifications to those agreements, the amount needed to reinstate the loan, that MTGLQ is not the beneficiary of the Note and therefore may not conduct a non-judicial foreclosure of Plaintiff's Property under the Oregon Trust Deed Act; and

2. Any other relief the Court deems equitable and just.

DATED: August 28, 2023                          /s/ Terry Scannell

SCANNELLAW, LLC
Terry Scannell, OSB#853220
Christopher E. Hayes, OSB#093777
7307 SW Beveland St., Suite 200
Tigard, OR 97223
Telephone: (503) 776-0806
Email:  *terry@scannellaw.com*
Email:  *chris@scannellaw.com*
*Of Attorneys for Plaintiff*

**Page 13 – COMPLAINT**

SCANNELLAW, LLC
7307 SW Beveland St. Ste 200
Tigard, Oregon 97223

**EXHIBIT 1**
**Page 13 of 100**

JLF 22-127672

# TRUSTEE'S NOTICE OF SALE

A default has occurred under the terms of a trust deed made by Joel Groshong, whose address is 2335 Sunset Drive, Forest Grove, OR 97116 as grantor to First American Title Company, as Trustee, in favor of American Pacific Bank, as named Beneficiary, dated January 24, 2002, recorded January 29, 2002, in the mortgage records of Washington County, Oregon, as Recorder's Fee No. 2002-011000, MTGLQ Investors, LP is the present Beneficiary as defined by ORS 86.705(2), as covering the following described real property:

A PARCEL OF LAND SITUATED IN THE WILLIAM B. STOKES DONATION LAND CLAIM NO. 61, IN SECTION 31, TOWNSHIP 1 NORTH, RANGE 3 WEST, OF THE WILLAMETTE MERIDIAN, IN THE CITY OF FOREST GROVE, COUNTY OF WASHINGTON AND STATE OF OREGON, MORE PARTICULARLY DESCRIBED AS FOLLOWS: BEGINNING AT THE SOUTHEAST CORNER OF THAT PARCEL CONVEYED TO EUGENE D. REVIER, ET UX, BY DEED RECORDED DECEMBER 10, 1971, IN BOOK 846, PAGE 526, FILM RECORDS, OF WASHINGTON COUNTY, OREGON, THE SAID SOUTHEAST CORNER BEING SOUTH 89°33' EAST 92.35 FEET AND SOUTH 0°24' WEST 75 FEET FROM THE INTERSECTION OF THE SOUTH LINE OF 24TH AVENUE AND THE EASTERLY LINE OF SUNSET DRIVE; THENCE NORTH 89°33' WEST 103.83 FEET TO A POINT ON THE EASTERLY LINE OF SUNSET DRIVE; THENCE SOUTHWESTERLY ALONG THE EASTERLY LINE OF SUNSET DRIVE 125.00 FEET, MORE OR LESS, TO THE SOUTHWEST CORNER OF LOT 8, BLOCK 3, CURTIS ADDITION TO THE CITY OF FOREST GROVE, THENCE EAST ALONG THE SOUTH LINES OF LOTS 8 AND 7 OF SAID BLOCK 3, A DISTANCE OF 130 FEET TO A POINT SOUTH 0°24' WEST FROM THE POINT OF BEGINNING; THENCE NORTH 0°24' EAST 125.00 FEET, MORE OR LESS, TO THE POINT OF BEGINNING.

**COMMONLY KNOWN AS:** 2335 Sunset Drive, Forest Grove, OR 97116

Both the beneficiary and the trustee have elected to sell the said real property to satisfy the obligations secured by said trust deed and a notice of default has been recorded pursuant to Oregon Revised Statutes 86.752(3); the default for which the foreclosure is made is grantor's failure to pay when due the following sums:

Delinquent Monthly payments from September 1, 2015 in the sum of $120,693.10, and monthly payments in the amount of $1,002.89 from September 1, 2022, plus prior accrued late charges in the amount of $100.28, plus the sum of $11,089.54 for advances, together with all costs, disbursements, and/or fees incurred or paid by the beneficiary and/or trustee, their employees, agents or assigns.

**EXHIBIT 1**
**Page 14 of 100**

By reason of said default the beneficiary has declared all sums owing on the obligation that the trust deed secures immediately due and payable, said sum being the following, to-wit:

$187,764.10, together with accrued interest in the sum of $50,956.02 through August 18, 2022, together with interest thereon at the rate of 4% per annum from August 19, 2022, plus prior accrued late charges in the amount of $100.28, plus the sum of $42,712.60 for advances, together with all costs, disbursements, and/or fees incurred or paid by the beneficiary and/or trustee, their employees, agents or assigns.

WHEREFORE, notice hereby is given that the undersigned trustee will on January 4, 2023, at the hour of 11:00 AM PT, in accord with the standard time established by ORS 187.110, on the steps of the 2nd Avenue entrance of the Washington County Courthouse, located at 145 N.E. 2nd Avenue, in the City of Hillsboro, OR, County of Washington, State of Oregon, sell at public auction to the highest bidder for cash the interest in the said described real property which the grantor has or had power to convey at the time of the execution of said trust deed, together with any interest which the grantor or his successors in interest acquired after the execution of said trust deed, to satisfy the foregoing obligations thereby secured and the costs and expenses of sale, including a reasonable charge by the trustee. Notice is further given to any person named in ORS 86.778 that the right exists, at any time that is not later than five days before the date last set for the sale, to have this foreclosure proceeding dismissed and the trust deed reinstated by paying to the beneficiary of the entire amount due (other than such portion of the principal as would not then be due had no default occurred) and by curing any other default complained of herein that is capable of being cured by tendering the performance required under the obligations or trust deed, and in addition to paying said sums or tendering the performance necessary to cure the default, by paying all costs and expenses actually incurred in enforcing the obligation and trust deed, together with trustee's fees and attorney's fees not exceeding the amounts provided by said ORS 86.778.

Notice is further given that reinstatement or payoff quotes requested pursuant to ORS 86.786 and ORS 86.789 must be timely communicated in a written request that complies with that statute, addressed to the trustee's "Reinstatements/Payoffs – ORS 86.786" either by personal delivery or by first class, certified mail, return receipt requested, to the trustee's address shown below. Due to potential conflicts with federal law, persons having no record legal or equitable interest in the subject property will only receive information concerning the lender's estimated or actual bid. Lender bid information is also available at the trustee's website, www.logs.com/janeway_law_firm.

In construing this notice, the masculine gender includes the feminine and the neuter, the singular includes the plural, the word "grantor" includes any successor in interest to the grantor as well as any other person owing an obligation, the performance of which is secured by said trust deed, and the words "trustee" and "beneficiary" include their respective successors in interest, if any.

Also, please be advised that pursuant to the terms stated on the Deed of Trust and Note, the beneficiary is allowed to conduct property inspections while property is in default. This shall serve as notice that the beneficiary shall be conducting property inspections on the said referenced property.

**EXHIBIT 1**
**Page 15 of 100**

Without limiting the trustee's disclaimer of representations or warranties, Oregon law requires the trustee to state in this notice that some residential property sold at a trustee's sale may have been used in manufacturing methamphetamines, the chemical components of which are known to be toxic. Prospective purchasers of residential property should be aware of this potential danger before deciding to place a bid for this property at the trustee's sale.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## NOTICE TO RESIDENTIAL TENANTS

The property in which you are living is in foreclosure. A foreclosure sale is scheduled for January 4, 2023. The date of this sale may be postponed. Unless the lender that is foreclosing on this property is paid before the sale date, the foreclosure will go through and someone new will own this property. After the sale, the new owner is required to provide you with contact information and notice that the sale took place.

The following information applies to you only if you are a bona fide tenant occupying and renting this property as a residential dwelling under a legitimate rental agreement. The information does not apply to you if you own this property or if you are not a bona fide residential tenant.

If the foreclosure sale goes through, the new owner will have the right to require you to move out. Before the new owner can require you to move, the new owner must provide you with written notice that specifies the date by which you must move out. If you do not leave before the move-out date, the new owner can have the sheriff remove you from the property after a court hearing. You will receive notice of the court hearing.

## PROTECTION FROM EVICTION

IF YOU ARE A BONA FIDE TENANT OCCUPYING AND RENTING THIS PROPERTY AS A RESIDENTIAL DWELLING, YOU HAVE THE RIGHT TO CONTINUE LIVING IN THIS PROPERTY AFTER THE FORECLOSURE SALE FOR:

- 60 DAYS FROM THE DATE YOU ARE GIVEN A WRITTEN TERMINATION NOTICE, IF YOU HAVE A FIXED TERM LEASE; OR

- AT LEAST 30 DAYS FROM THE DATE YOU ARE GIVEN A WRITTEN TERMINATION NOTICE, IF YOU HAVE A MONTH-TO-MONTH OR WEEK-TO-WEEK RENTAL AGREEMENT.

If the new owner wants to move in and use this property as a primary residence, the new owner can give you written notice and require you to move out after 30 days, even though you have a fixed term lease with more than 30 days left.

You must be provided with at least 30 days' written notice after the foreclosure sale before you can be required to move.

**EXHIBIT 1**
**Page 16 of 100**

A bona fide tenant is a residential tenant who is not the borrower (property owner) or a child, spouse or parent of the borrower, and whose rental agreement:

  • Is the result of an arm's-length transaction;

  • Requires the payment of rent that is not substantially less than fair market rent for the property, unless the rent is reduced or subsidized due to a federal, state or local subsidy; and

  • Was entered into prior to the date of the foreclosure sale.

ABOUT YOUR TENANCY BETWEEN NOW AND THE FORECLOSURE SALE:

RENT

YOU SHOULD CONTINUE TO PAY RENT TO YOUR LANDLORD UNTIL THE PROPERTY IS SOLD OR UNTIL A COURT TELLS YOU OTHERWISE. IF YOU DO NOT PAY RENT, YOU CAN BE EVICTED. BE SURE TO KEEP PROOF OF ANY PAYMENTS YOU MAKE.

SECURITY DEPOSIT

You may apply your security deposit and any rent you paid in advance against the current rent you owe your landlord as provided in ORS 90.367. To do this, you must notify your landlord in writing that you want to subtract the amount of your security deposit or prepaid rent from your rent payment. You may do this only for the rent you owe your current landlord. If you do this, you must do so before the foreclosure sale. The business or individual who buys this property at the foreclosure sale is not responsible to you for any deposit or prepaid rent you paid to your landlord.

ABOUT YOUR TENANCY AFTER THE FORECLOSURE SALE

The new owner that buys this property at the foreclosure sale may be willing to allow you to stay as a tenant instead of requiring you to move out after 30 or 60 days. After the sale, you should receive a written notice informing you that the sale took place and giving you the new owner's name and contact information. You should contact the new owner if you would like to stay. If the new owner accepts rent from you, signs a new residential rental agreement with you or does not notify you in writing within 30 days after the date of the foreclosure sale that you must move out, the new owner becomes your new landlord and must maintain the property. Otherwise:

  • You do not owe rent;
  • The new owner is not your landlord and is not responsible for maintaining the property on your behalf; and
  • You must move out by the date the new owner specifies in a notice to you.

**EXHIBIT 1**
**Page 17 of 100**

The new owner may offer to pay your moving expenses and any other costs or amounts you and the new owner agree on in exchange for your agreement to leave the premises in less than 30 or 60 days. You should speak with a lawyer to fully understand your rights before making any decisions regarding your tenancy.

IT IS UNLAWFUL FOR ANY PERSON TO TRY TO FORCE YOU TO LEAVE YOUR DWELLING UNIT WITHOUT FIRST GIVING YOU WRITTEN NOTICE AND GOING TO COURT TO EVICT YOU. FOR MORE INFORMATION ABOUT YOUR RIGHTS, YOU SHOULD CONSULT A LAWYER. If you believe you need legal assistance, contact the Oregon State Bar and ask for the lawyer referral service. Contact information for the Oregon State Bar is included with this notice. If you do not have enough money to pay a lawyer and are otherwise eligible, you may be able to receive legal assistance for free. Information about whom to contact for free legal assistance is included with this notice.

OREGON STATE BAR, 16037 S.W. Upper Boones Ferry Road, Tigard, Oregon 97224, Phone (503) 620-0222, Toll-free 1-800-452-8260 Website:   http://www.osbar.org

Directory of Legal Aid Programs:   http://www.oregonlawhelp.org

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

The Fair Debt Collection Practice Act requires that we state the following:  This is an attempt to collect a debt, and any information obtained will be used for that purpose.  If a discharge has been obtained by any party through bankruptcy proceedings:  This shall not be construed to be an attempt to collect the outstanding indebtedness or hold you personally liable for the debt.

    The Successor Trustee, Janeway Law Firm, LLC, has authorized the undersigned Attorney to execute the document on the Successor Trustee's behalf as allowed under ORS 86.713(9).

Dated: _8/26/2022_               By: _____

                                   OSB# _872575_
                                   JANEWAY LAW FIRM, LLC,
                                   Successor Trustee
                                   1499 SE Tech Center Place, Suite 255
                                   Vancouver, WA 98683
                                   www.logs.com/janeway_law_firm
                                   Telephone: (360) 260-2253
                                   Toll-free:  1-800-970-5647
                                   JLF 22-127672

    I, the undersigned certify that the foregoing instrument is a complete and exact copy of the original Trustee's Notice of Sale

EXHIBIT 1
Page 18 of 100

EXHIBIT "A"

EXHIBIT 1
Page 19 of 100

1139642

# NOTE

84404 6445145

January 24, 2002
[Date]

PORTLAND, OR
[City / State]

2335 SUNSET DRIVE, FOREST GROVE, OR  97116
[Property Address]

**1. BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S. $189,600.00 (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is AMERICAN PACIFIC BANK. I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2. INTEREST**

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 7.000%.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

**3. PAYMENTS**

**(A) Time and Place of Payments**

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the 1st day of each month beginning on March 1, 2002. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on February 1, 2032, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at AMERICAN PACIFIC BANK, 315 SW 5th AVENUE, PORTLAND, OR  97204 or at a different place if required by the Note Holder.

**(B) Amount of Monthly Payments**

My monthly payment will be in the amount of U.S. $1,261.41.

**4. BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

**5. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**6. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of 15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.000% of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**7. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

MULTISTATE FIXED RATE NOTE—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                Form 3200 1/01
Page 1 of 2

**EXHIBIT 1**

that I must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**8. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**9. WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**10. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)
JOEL GROSHONG – Borrower
Social Security Number – 541–60–9343

[Sign Original Only]

WITHOUT RECOURSE PAY TO THE
ORDER OF

WASHINGTON MUTUAL BANK, FA

AMERICAN PACIFIC BANK

JAMES D. HARTY
VICE PRESIDENT

WITHOUT RECOURSE
PAY TO THE ORDER OF

WASHINGTON MUTUAL BANK, FA, successor to
NORTH AMERICAN MORTGAGE COMPANY

BY
MELISSA STEVEN, ASSISTANT SECRETARY

Washington County, Oregon **2009-002158**
01/09/2009 03:12:12 PM
D-MDES          Cnt=1 Stn=22 I REED
$15.00 $5.00 $11.00 - Total = $31.00

0131907420090002158003033
I, Richard Hobernicht, Director of Assessment and
Taxation and Ex-Officio County Clerk for Washington
County, Oregon, do hereby certify that the within
instrument of writing was received and recorded in the
book of records of said county.
Richard Hobernicht, Director of Assessment and
Taxation, Ex-Officio County Clerk

AFTER RECORDING RETURN TO:
Shapiro & Sutherland, LLC
5501 N.E. 109th Court, Suite N
Vancouver, WA 98662
09-101489

# NOTICE OF DEFAULT AND ELECTION TO SELL

A default has occurred under the terms of a trust deed made by Joel Groshong, as grantor to First American Title Company, as trustee, in favor of American Pacific Bank, as beneficiary, dated January 24, 2002, recorded January 29, 2002, in the mortgage records of Washington County, Oregon as Instrument/Reception/Recorder's Fee No. Recorder's Fee No. 2002-011000, as covering the following described real property:

See complete Legal Description attached hereto as Exhibit "A"

**COMMONLY KNOWN AS:** 2335 Sunset Drive, Forest Grove, OR 97116

Kelly D. Sutherland, Successor Trustee, hereby certifies that no action has been instituted to recover the debt, or any part thereof, now remaining secured by the said trust deed, or, if such action has been instituted, such action has been dismissed except as permitted by ORS 86.735(4).

There is a default by the grantor or other person owing an obligation, the performance of which is secured by said trust deed, or by their successor in interest, with respect to provisions therein which authorize sale in the event of default of such provision; the default for which foreclosure is made is grantor's failure to pay when due the following sums:

Monthly payments in the sum of $1,261.41, from October 1, 2008, together with all costs, disbursements, and/or fees incurred or paid by the beneficiary and/or trustee, their employees, agents or assigns.

By reason of said default, the beneficiary has declared all sums owing on the obligation secured by said trust deed immediately due and payable, said sums being the following, to-wit:

$174,060.58, together with interest thereon at the rate of 7% per annum from September 1, 2008, together with all costs, disbursements, and/or fees incurred or paid by the beneficiary and/or trustee, their employees, agents or assigns.

Notice hereby is given that the beneficiary and trustee, by reason of said default, have elected and do hereby elect to foreclosure said trust deed by advertisement and sale pursuant to ORS 86.705 to 86.795, and to cause to be sold at public auction to the highest bidder for cash the execution by him of the trust deed, together with any interest the grantor or his successors in

**EXHIBIT 1**
**Page 22 of 100**

interest acquired after the execution of the trust deed, to satisfy the obligations secured by said trust deed and the expenses of the sale, including the compensations of the trustee as provided by law, and the reasonable fees of trustee's attorneys.

Said sale will be held at the hour of 11:00 AM PT, in accordance with the standard time established by ORS 187.110 on May 14, 2009, at the following place: on the steps of the 2nd Avenue entrance of the Washington County Courthouse, located at 145 N.E. 2nd Avenue, in the City of Hillsboro, County of Washington, State of Oregon, which is the hour, date and place last set for said sale.

Notice is further given that any person named in ORS 86.753 has the right, at any time prior to five days before the date last set for the sale, to have this foreclosure proceeding dismissed and the trust deed reinstated by payment to the beneficiary of the entire amount then due (other than such portion of the principal as would not then be due had no default occurred) and by curing any other default complained of herein that is capable of being cured by tendering the performance required under the obligation or trust deed, and in addition to paying said sums or tendering the performance necessary to cure the default by paying all costs and expenses actually incurred in enforcing the obligation and trust deed, together with trustee's and attorneys fees not exceeding the amounts provided by said ORS 86.753.

In construing this notice, the masculine gender includes the feminine and the neuter, the singular includes the plural, the word "grantor" includes any successor in interest to the grantor as well as any other person owing an obligation, the performance of which is secured by said trust deed, and the words "trustee" and beneficiary" include their respective successors in interest, if any.

The Fair Debt Collection Practice Act requires that we state the following: This is an attempt to collect a debt, and any information obtained will be used for that purpose. If a discharge has been obtained by any party through bankruptcy proceedings:  This shall not be construed to be an attempt to collect the outstanding indebtedness or hold you personally liable for the debt.

Dated: _____1/8/2009_____          By: _____
                                        **KELLY D. SUTHERLAND**
                                        Successor Trustee

STATE OF WASHINGTON        )
                           ) SS.
COUNTY OF CLARK            )

SUBSCRIBED AND SWORN to before me this 8th day of January, 2009, by Kelly D. Sutherland, Successor Trustee.

_____
Notary Public for Washington
My commission expires __11/29/2011__

LYNNETTE S. ALLEN
NOTARY PUBLIC
STATE OF WASHINGTON
COMMISSION EXPIRES
NOVEMBER 29, 2011

**EXHIBIT 1**
**Page 23 of 100**

Exhibit "A"

A parcel of land situated in the William B. Stokes Donation-Land Claim No. 61, in Section 31, Township 1 North, Range 3 West of the Willamette Meridian, in the City of Forest Grove County of Washington and State of Oregon, and described as follows:

Beginning at the Southeast corner of that parcel conveyed to Eugene D. Revier, et ux, by deed recorded December 10, 1971, in Volume 846. Page 526, Film Records, in the County of Washington and State of Oregon, the said Southeast corner being South 89°33' East 92.35 feet and South 00° 24' West 75 feet from the intersection of the South line of 24th Avenue and the Easterly line of Sunset Drive; thence Southwesterly along the Easterly line of Sunset Drive 125.00 feet, more or less, to the Southwest corner of Lot 8, Block 3 of CURTIS ADDITION TO THE CITY OF FOREST GROVE; thence East along the South lines of Lots 8 and 7 of said Block 3, a distance of 130 feet to a point South 00°24' West from the point of beginning; thence North 00°24' East 125.00 feet, more or less, to the point of beginning.

**EXHIBIT 1**
**Page 24 of 100**

UNITED STATES OF AMERICA
BEFORE THE
BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM
WASHINGTON, D.C.

| | |
|---|---|
| In the Matter of<br><br>JPMORGAN CHASE & CO.<br>New York, New York<br><br>and<br><br>EMC MORTGAGE CORPORATION<br>Lewisville, Texas | Docket No.  11-023-B-HC<br>11-023-B-DEO |

**CONSENT ORDER**

WHEREAS, JPMorgan Chase & Co., New York, New York ("JPMC"), a registered bank holding company, owns and controls JPMorgan Chase Bank, National Association, Columbus, Ohio (the "Bank"), a national bank, and numerous direct and indirect nonbank subsidiaries, including EMC Mortgage Corporation, Lewisville, Texas ("EMC") and its direct and indirect subsidiaries;

WHEREAS, JPMC has engaged in the business of servicing residential mortgage loans through non-bank subsidiaries, including EMC and its subsidiaries (collectively, the "Mortgage Servicing Companies"), as well as through the Bank.  The Mortgage Servicing Companies have serviced residential mortgage loans that are held in the portfolios of: (a) EMC and its subsidiaries; (b) the Federal National Mortgage Association, the Federal Home Loan Mortgage Corporation, and the Government National Mortgage Association (collectively, the "GSEs"); and (c) various investors, including securitization trusts pursuant to Pooling and Servicing

**EXHIBIT 1**
**Page 25 of 100**

Agreements and similar agreements (collectively, the "Servicing Portfolio"). The Mortgage

Servicing Companies have had substantial responsibilities with respect to the Servicing Portfolio

for the initiation and handling of foreclosure proceedings, and loss mitigation activities ("Loss

Mitigation" or "Loss Mitigation Activities" include activities related to special forbearances,

repayment plans, modifications, short refinances, short sales, cash-for-keys, and deeds-in-lieu of

foreclosure);

WHEREAS, on or about April 1, 2011, JPMC transferred all of the residential mortgage

loan servicing rights and certain related assets and liabilities of the Mortgage Servicing

Companies to the Bank (the "EMC Servicing Rights Transfer"). Following consummation of

that transfer, the Mortgage Servicing Companies are no longer in the business of residential

mortgage loan servicing, and only the Bank is conducting residential mortgage loan servicing

within the JPMC organization;

WHEREAS, JPMC, through the Bank and the Mortgage Servicing Companies,

collectively, is the third largest servicer of residential mortgages in the United States and services

a portfolio of 8.5 million residential mortgage loans. During the recent financial crisis, a

substantially larger number of residential mortgage loans became past due than in earlier years.

Many of the past due mortgages have resulted in foreclosure actions. From January 1, 2009, to

December 31, 2010, the Mortgage Servicing Companies initiated 256,179 foreclosure actions;

WHEREAS, in connection with the process leading to certain foreclosures involving the

Servicing Portfolio, the Mortgage Servicing Companies allegedly:

(a)      Filed or caused to be filed in state courts and in connection with bankruptcy

proceedings in federal courts numerous affidavits executed by employees of the

Mortgage Servicing Companies or employees of third-party providers making various

2

EXHIBIT 1
Page 26 of 100

assertions, such as the ownership of the mortgage note and mortgage, the amount of principal and interest due, and the fees and expenses chargeable to the borrower, in which the affiant represented that the assertions in the affidavit were made based on personal knowledge or based on a review by the affiant of the relevant books and records, when, in many cases, they were not based on such knowledge or review;

(b)    Filed or caused to be filed in state courts and in connection with bankruptcy proceedings in federal courts or in the local land record offices, numerous affidavits and other mortgage-related documents that were not properly notarized, including those not signed or affirmed in the presence of a notary;

(c)    Litigated foreclosure and bankruptcy proceedings and initiated non-judicial foreclosures without always confirming that documentation of ownership was in order at the appropriate time, including confirming that the promissory note and mortgage document were properly endorsed or assigned and, if necessary, in the possession of the appropriate party;

(d)    Failed to respond in a sufficient and timely manner to the increased level of foreclosures by increasing financial, staffing, and managerial resources to ensure that the Mortgage Servicing Companies adequately handled the foreclosure process; failed to respond in a sufficient and timely manner to the increased level of Loss Mitigation Activities to ensure timely, effective and efficient communication with borrowers with respect to Loss Mitigation Activities and foreclosure activities; and full exploration of Loss Mitigation options or programs prior to completion of foreclosure activities; and

(e)     Failed to have adequate internal controls, policies and procedures, compliance risk management, internal audit, training, and oversight of the foreclosure process, including sufficient oversight of outside counsel and other third-party providers handling foreclosure-related services with respect to the Servicing Portfolio.

WHEREAS, the practices set forth above allegedly constitute unsafe or unsound banking practices;

WHEREAS, as part of a horizontal review of various major residential mortgage servicers conducted by the Board of Governors of the Federal Reserve System (the "Board of Governors"), the Federal Deposit Insurance Corporation (the "FDIC"), the Office of the Comptroller of the Currency (the "OCC"), and the Office of Thrift Supervision, examiners from the Federal Reserve Bank of New York (the "Reserve Bank") have reviewed certain residential mortgage loan servicing and foreclosure-related processes at the Mortgage Servicing Companies, and examiners from the OCC have reviewed certain residential mortgage loan servicing and foreclosure-related practices at the Bank;

WHEREAS, the Bank and the OCC have entered into a consent order to address areas of weakness identified by the OCC in residential mortgage loan servicing, Loss Mitigation, foreclosure activities, and related functions (the "OCC Consent Order"). Following the EMC Servicing Rights Transfer, the Servicing Portfolio will be subject to the terms of the OCC Consent Order;

WHEREAS, in the OCC Consent Order, the OCC has made findings, which the Bank neither admitted nor denied, that there were unsafe or unsound practices with respect to the manner in which the Bank handled various foreclosure and related activities;

4

EXHIBIT 1
Page 28 of 100

WHEREAS, it is the common goal of the Board of Governors, the Reserve Bank, JPMC, and the Mortgage Servicing Companies (to the extent that the Mortgage Loan Servicing Companies engage in residential mortgage loan servicing in the future) ensure that the consolidated organization operates in a safe and sound manner and in compliance with the terms of mortgage loan documentation and related agreements with borrowers, all applicable state and federal laws (including the U.S. Bankruptcy Code and the Servicemembers Civil Relief Act), rules, regulations, and court orders, as well as the Membership Rules of MERSCORP, Inc. and MERS, Inc. (collectively, "MERS"), servicing guides with GSEs or investors, and other contractual obligations including those with the Federal Housing Administration and those required by the Home Affordable Modification Program ("HAMP"), and loss share agreements with the FDIC (collectively, "Legal Requirements");

WHEREAS, after the conduct set forth above became known, JPMC and the Mortgage Servicing Companies have been taking steps to remediate the filing of and reliance on inaccurate affidavits in foreclosure and bankruptcy proceedings;

WHEREAS, the boards of directors of JPMC and EMC, at duly constituted meetings, adopted resolutions authorizing and directing Frank J. Bisignano, and Anthony J. Horan to enter into this Consent Order to Cease and Desist (the "Order") on behalf of JPMC and EMC, respectively, and consenting to compliance with each and every applicable provision of this Order by JPMC and EMC, and their institution-affiliated parties, as defined in sections 3(u) and 8(b)(3) of the Federal Deposit Insurance Act, as amended (the "FDI Act") (12 U.S.C. §§ 1813(u) and 1818(b)(3)), and waiving any and all rights that JPMC and EMC may have pursuant to section 8 of the FDI Act (12 U.S.C. § 1818), including, but not limited to: (i) the issuance of a notice of charges; (ii) a hearing for the purpose of taking evidence on any matters set forth in this

Order; (iii) judicial review of this Order; (iv) contest the issuance of this Order by the Board of Governors; and (v) challenge or contest, in any manner, the basis, issuance, validity, terms, effectiveness or enforceability of this Order or any provision hereof.

NOW, THEREFORE, before the filing of any notices, or taking of any testimony or adjudication of or finding on any issues of fact or law herein, and without this Order constituting an admission by JPMC, EMC or its subsidiaries, of any allegation made or implied by the Board of Governors in connection with this matter, and solely for the purpose of settling this matter without a formal proceeding being filed and without the necessity for protracted or extended hearings or testimony, it is hereby ordered by the Board of Governors that, pursuant to sections 8(b)(1) and (3) of the FDI Act (12 U.S.C. §§1818(b)(1) and 1818(b)(3)), JPMC and EMC, and their institution-affiliated parties shall cease and desist and take affirmative action, as follows:

**Source of Strength**

1.      The board of directors of JPMC shall take appropriate steps to fully utilize JPMC's financial and managerial resources, pursuant to section 225.4(a) of Regulation Y of the Board of Governors (12 C.F.R. § 225.4(a)), to serve as a source of strength to the Bank, including, but not limited to, taking steps to ensure that the Bank complies with the Consent Order issued by the OCC regarding the Bank's residential mortgage loan servicing activities.

**Board Oversight**

2.      Within 60 days of this Order, the board of directors of JPMC shall submit to the Reserve Bank an acceptable written plan to strengthen the board's oversight of JPMC's enterprise-wide risk management ("ERM"), internal audit, and compliance programs concerning

6

**EXHIBIT 1**
**Page 30 of 100**

the residential mortgage loan servicing, Loss Mitigation, and foreclosure activities conducted through the Bank.  The plan shall, at a minimum, address, consider, and include:

(a)    Policies to be adopted by the board of directors of JPMC that are designed to ensure that the ERM program provides proper risk management oversight with respect to the Bank's residential mortgage loan servicing, Loss Mitigation, and foreclosure activities, particularly with respect to compliance with the Legal Requirements, and supervisory standards and guidance of the Board of Governors as they develop;

(b)    policies and procedures adopted by JPMC to ensure that the ERM program provides proper risk management of independent contractors, consulting firms, law firms, or other third parties who are engaged to support residential mortgage loan servicing, Loss Mitigation, or foreclosure activities or operations, including their compliance with the Legal Requirements and JPMC's internal policies and procedures, consistent with supervisory guidance of the Board of Governors;

(c)    steps to ensure that JPMC's ERM, audit, and compliance programs have adequate levels and types of officers and staff dedicated to overseeing the Bank's residential mortgage loan servicing, Loss Mitigation, and foreclosure activities, and that these programs have officers and staff with the requisite qualifications, skills, and abilities to comply with the requirements of this Order; and

(d)    steps to improve the information and reports that will be regularly reviewed by the board of directors of JPMC or authorized committee of the board of directors regarding residential mortgage loan servicing, Loss Mitigation, and foreclosure activities and operations, including compliance risk assessments and the status and results of measures taken,

7

**EXHIBIT 1**
**Page 31 of 100**

or to be taken, to remediate deficiencies in residential mortgage loan servicing, Loss Mitigation, and foreclosure activities, and to comply with this Order.

**Foreclosure Review**

3.    (a)    Within 45 days of this Order, JPMC and EMC shall retain one or more independent consultant(s) acceptable to the Reserve Bank to conduct an independent review of certain residential mortgage loan foreclosure actions (including judicial and non-judicial foreclosures and related bankruptcy proceedings, and other related litigation) regarding individual borrowers with respect to the Servicing Portfolio that was serviced by EMC.  The review shall include actions or proceedings (including foreclosures that were in process or completed) for residential mortgage loans serviced by the Mortgage Servicing Companies whether brought in the name of the JPMC, the Mortgage Servicing Companies, the investor, or any agent for the mortgage note holder (including MERS) that have been pending at any time from January 1, 2009, to December 31, 2010, as well as residential foreclosure sales that occurred during this time period ("Foreclosure Review").  The purpose of the Foreclosure Review shall be to determine, at a minimum:

(i)    whether, at the time the foreclosure action was initiated or the pleading or affidavit filed (including in bankruptcy proceedings and in defending suits brought by borrowers), the foreclosing party or agent of the party had properly documented ownership of the promissory note and mortgage (or deed of trust) under relevant state law, or was otherwise a proper party to the action as a result of agency or other similar status;

(ii)    whether the foreclosure was in accordance with applicable federal and state laws, including but not limited to, the Servicemembers Civil Relief Act and the U.S. Bankruptcy Code;

8

**EXHIBIT 1**
**Page 32 of 100**

(iii)     whether, with respect to non-judicial foreclosures, the procedures followed with respect to the foreclosure sale (including the calculation of the default period, the amounts due, and compliance with notice periods) and post-sale confirmation were in accordance with the terms of the mortgage loan and state law requirements;

(iv)     whether a foreclosure sale occurred when the borrower had requested a loan modification or other loss mitigation and the request was under consideration, when the loan was performing in accordance with a trial or permanent loan modification, or when the loan had  not been in default for a sufficient period to authorize foreclosure pursuant to terms of the mortgage loan documentation and related agreements;

(v)     whether any delinquent borrower's account was charged fees or penalties that were not permissible under the terms of the borrower's loan documents, state or federal law, or were otherwise unreasonable.  For purposes of this Order, a fee or penalty is "otherwise unreasonable" if it was assessed: (i) for the purpose of protecting the secured party's interest in the mortgaged property, and the fee or penalty was assessed at a frequency or rate, was of a type or amount, or was for a purpose that was in fact not needed to protect the secured party's interest; (ii) for services performed and the fee charged was substantially in excess of the fair market value of the service; (iii) for services performed, and the services were not actually performed; or (iv) at an amount or rate that exceeds what was customarily charged in the market for such a fee or penalty, and the mortgage instruments or other documents executed by the borrower did not disclose the amount or rate that the lender or servicer would charge for such a fee or penalty;

(vi)     whether Loss Mitigation Activities with respect to foreclosed loans were handled in accordance with the requirements of HAMP, if applicable, and consistent with

**EXHIBIT 1**
**Page 33 of 100**

the policies and procedures applicable to the Mortgage Servicing Companies' proprietary loan modifications or other Loss Mitigation programs, such that each borrower had an adequate opportunity to apply for a Loss Mitigation option or program, any such application was handled appropriately, and a final decision was made on a reasoned basis and was communicated to the borrower before the foreclosure sale; and

(vii)    whether any errors, misrepresentations, or other deficiencies identified in the Foreclosure Review resulted in financial injury to the borrower or the owner of the mortgage loan.

(b)    The independent consultant(s) shall prepare a written report detailing the findings of the Foreclosure Review (the "Foreclosure Report"). JPMC and EMC shall provide to the Reserve Bank a copy of the Foreclosure Report at the same time that the report is provided to them.

(c)    Within 30 days of receipt of the Foreclosure Report, JPMC and EMC shall submit to the Reserve Bank an acceptable plan to:

(i)    remediate, as appropriate, errors, misrepresentations, or other deficiencies in any foreclosure filing or other proceeding;

(ii)    reimburse or otherwise provide appropriate remediation to the borrower for any impermissible or otherwise unreasonable penalties, fees or expenses, or for other financial injury identified in paragraph 3 of this Order;

(iii)    make appropriate adjustments for the account of JPMC, the GSEs, or any investor; and

(iv)    take appropriate steps to remediate any foreclosure sale where the foreclosure was not authorized as described in paragraph 3.

10

**EXHIBIT 1**
**Page 34 of 100**

(d)     Within 60 days after the Reserve Bank accepts the plan described in paragraph 3(c), the JPMC and EMC shall make all reimbursement and remediation payments and provide all credits required by such plan, and provide the Reserve Bank with a report detailing such payments and credits;

(e)     JPMC shall take all steps necessary to ensure that the Bank provides any cooperation needed by the independent consultant(s) to complete the independent review.

4.     Within 5 days of the engagement of the independent consultant(s) described in paragraph 3 of this Order, but prior to the commencement of the Foreclosure Review, JPMC and EMC shall submit to the Reserve Bank for approval an engagement letter that sets forth:

(a)     The methodology for conducting the Foreclosure Review, including: (i) a description of the information systems and documents to be reviewed, including the selection criteria for cases to be reviewed; (ii) the criteria for evaluating the reasonableness of fees and penalties under paragraph 3(a)(v); (iii) other procedures necessary to make the required determinations (such as through interviews of employees and third parties and a process for the receipt and review of borrower claims and complaints); and (iv) any proposed sampling techniques.  In setting the scope and review methodology, the independent consultant may consider any work already done by JPMC, EMC, or other third-parties on behalf of JPMC or EMC.  With respect to sampling techniques, the engagement letter shall contain a full description of the statistical basis for the sampling methods chosen, as well as procedures to increase the size of the sample depending on the results of initial sampling;

(b)     the expertise and resources to be dedicated to the Foreclosure Review;

(c)     completion of the Foreclosure Review and the Foreclosure Report within 120 days of the start of the engagement; and

**EXHIBIT 1**
**Page 35 of 100**

(d)    a written commitment that any workpapers associated with the Foreclosure Review will be made available to the Reserve Bank upon request.

**Compliance Program**

5.    Within 60 days of this Order, JPMC shall submit to the Reserve Bank an acceptable written plan to enhance its enterprise-wide compliance program ("ECP") with respect to its oversight of residential mortgage loan servicing, Loss Mitigation, and foreclosure activities and operations.  The enhanced plan shall be based on an evaluation of the effectiveness of JPMC's current ECP in the areas of residential mortgage loan servicing, Loss Mitigation, and foreclosure activities and operations, and recommendations to strengthen the ECP in these areas. The plan shall, at a minimum, be designed to:

(a)    Ensure that the fundamental elements of the ECP and any enhancements or revisions thereto, including a comprehensive annual risk assessment, encompass residential mortgage loan servicing, Loss Mitigation, and foreclosure activities;

(b)    ensure compliance with the Legal Requirements and supervisory guidance of the Board of Governors; and

(c)    ensure that policies, procedures, and processes are updated on an ongoing basis as necessary to incorporate new or changes to the Legal Requirements and supervisory guidance of the Board of Governors.

**Audit**

6.    Within 60 days of this Order, JPMC shall submit to the Reserve Bank an acceptable written plan to enhance the internal audit program with respect to residential mortgage loan servicing, Loss Mitigation, and foreclosure activities and operations.  The plan shall be based on an evaluation of the effectiveness of JPMC's current internal audit program in

**EXHIBIT 1**
**Page 36 of 100**

the areas of residential mortgage loan servicing, Loss Mitigation, and foreclosure activities and operations, and shall include recommendations to strengthen the internal audit program in these areas. The plan shall, at a minimum, be designed to:

(a) Ensure that the internal audit program encompasses residential mortgage loan servicing, Loss Mitigation, and foreclosure activities;

(b) periodically review the effectiveness of the ECP and ERM with respect to residential mortgage loan servicing, Loss Mitigation, and foreclosure activities, and compliance with the Legal Requirements and supervisory guidance of the Board of Governors;

(c) ensure that adequate qualified staffing of the audit function is provided for loan servicing, Loss Mitigation, and foreclosure activities;

(d) ensure timely resolution of audit findings and follow-up reviews to ensure completion and effectiveness of corrective measures;

(e) ensure that comprehensive documentation, tracking, and reporting of the status and resolution of audit findings are submitted to the audit committee; and

(f) establish escalation procedures for resolving any differences of opinion between audit staff and management concerning audit exceptions and recommendations, with any disputes to be resolved by the audit committee.

**Risk Management**

7. Within 60 days of this Order, JPMC shall submit to the Reserve Bank an acceptable written plan to enhance its ERM program with respect to its oversight of residential mortgage loan servicing, Loss Mitigation, and foreclosure activities and operations. The enhanced plan shall be based on an evaluation of the effectiveness of JPMC's current ERM program in the areas of residential mortgage loan servicing, Loss Mitigation, and foreclosure

13

**EXHIBIT 1**
**Page 37 of 100**

activities and operations, and recommendations to strengthen the risk management program in these areas.  The plan shall, at a minimum, be designed to:

(a)    Ensure that the fundamental elements of the risk management program and any enhancements or revisions thereto, including a comprehensive annual risk assessment, encompass residential mortgage loan servicing, Loss Mitigation, and foreclosure activities;

(b)    ensure that the risk management program complies with supervisory guidance of the Board of Governors, including, but not limited to, the guidance entitled, "Compliance Risk Management Programs and Oversight at Large Banking Organizations with Complex Compliance Profiles," dated October 16, 2008 (SR 08-08/CA 08-11); and

(c)    establish limits for compliance, legal, and reputational risks and provide for regular review of risk limits by appropriate senior management and the board of directors or authorized committee of the board of directors.

**Approval, Implementation, and Progress Reports**

8.    (a)    JPMC and EMC, as applicable, shall submit written plans and an engagement letter that are acceptable to the Reserve Bank within the applicable time periods set forth in paragraphs 2, 3(c), 4, 5, 6, and 7 of this Order.  Independent consultant(s) acceptable to the Reserve Bank shall be retained by JPMC and EMC within the applicable period set forth in paragraph 3(a) of this Order.

(b)    Within 10 days of approval by the Reserve Bank, JPMC and EMC, as applicable, shall adopt the approved plans.  Upon adoption, JPMC and EMC, as applicable, shall implement the approved plans, and thereafter fully comply with them.

(c)    During the term of this Order, the approved plans and engagement letter shall not be amended or rescinded without the prior written approval of the Reserve Bank.

14

**EXHIBIT 1**
**Page 38 of 100**

(d)    During the term of this Order, JPMC and EMC, as applicable, shall revise the approved plans as necessary to incorporate new or changes to the Legal Requirements and supervisory guidance of the Board of Governors.  The revised plans shall be submitted to the Reserve Bank for approval at the same time as the progress reports described in paragraph 9 of this Order.

9.    Within 30 days after the end of each calendar quarter following the date of this Order, JPMC's and EMC's boards of directors shall jointly submit to the Reserve Bank written progress reports detailing the form and manner of all actions taken to secure compliance with the provisions of this Order and the results thereof.  The Reserve Bank may, in writing, discontinue the requirement for progress reports or modify the reporting schedule.

**Notices**

10.    All communications regarding this Order shall be sent to:

(a)    Ms. Barbara Yelcich
Assistant Vice President
Federal Reserve Bank of New York
33 Liberty Street
New York, New York 10045

(b)    Mr. David Lowman
Chief Executive Office
Chase Home Lending
JPMorgan Chase & Co.
194 Wood Avenue South
Iselin, New Jersey 08830

(c)    Mr. Anthony J. Horan
Senior Vice President and Assistant Secretary
EMC Mortgage Corporation
270 Park Avenue, 38th Floor
New York, New York 10017

15

**EXHIBIT 1**
**Page 39 of 100**

**Miscellaneous**

11.    The provisions of this Order shall be binding on JPMC, EMC and each of their institution-affiliated parties in their capacities as such, and their successors and assigns.

12.    Each provision of this Order shall remain effective and enforceable until stayed, modified, terminated, or suspended in writing by the Reserve Bank.

13.    Notwithstanding any provision of this Order, the Reserve Bank may, in its sole discretion, grant written extensions of time to JPMC and EMC to comply with any provision of this Order.

14.    The provisions of this Order shall not bar, estop, or otherwise prevent the Board of Governors, the Reserve Bank, or any other federal or state agency or department from taking any further or other action affecting JPMC, EMC, or any of their current or former institution-affiliated parties or their successors or assigns, or any other of JPMC's subsidiaries.

**EXHIBIT 1**
**Page 40 of 100**

15.    Nothing in this Order, express or implied, shall give to any person or entity, other than the parties hereto, and their successors hereunder, any benefit or any legal or equitable right, remedy, or claim under this Order.

By Order of the Board of Governors effective this  13th day of April, 2011.

JPMORGAN CHASE & CO.                    BOARD OF GOVERNORS OF THE
                                        FEDERAL RESERVE SYSTEM


By:  /s/ Frank J. Bisignano             By:  /s/ Jennifer J. Johnson_____
       Frank J. Bisignano                     Jennifer J. Johnson
       Chief Administrative Officer            Secretary of the Board


EMC MORTGAGE CORPORATION


By:  /s/ Anthony J. Horan_____
       Anthony J. Horan
       Senior Vice President

17

EXHIBIT 1
Page 41 of 100

**IN UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**JACKSON DIVISION**

| | | | |
|---|---|---|---|
| IN RE: | **JOEL C. GROSHONG** | * | **CHAPTER 11** |
| | Debtor | * | **CASE NO. 11-02179-KMS** |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

<u>**MOTION UNDER 11 U.S.C. §§ 361 AND 363(e)**</u>
<u>**TO PROHIBIT USE OF CASH COLLATERAL AND**</u>
<u>**FOR ADEQUATE PROTECTION, OR IN THE ALTERNATIVE,**</u>
<u>**FOR RELIEF FROM THE AUTOMATIC STAY**</u>

JP Morgan Chase Bank, N.A. ("Chase"), in its own capacity and as servicer for the securitized loan trusts described in more detail in this Motion, hereby moves under sections 361 and 363(e) of the United States Bankruptcy Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code"), for an order prohibiting Joel C. Groshong, the individual debtor in this Chapter 11 case (the "Debtor"), from using any of Chase's cash collateral and compelling him to immediately account for and turn over to Chase all rents and revenues that he or his affiliates have received from the properties securing Chase's claims since the Petition Date (defined below). In the alternative, Chase seeks an order lifting section 362(a)'s automatic stay so that Chase may enforce its rights under its loan agreements with the Debtor. In support of this motion, Chase respectfully represents:

1.

<u>**SUMMARY OF RELIEF REQUESTED**</u>

The "Debtor" is primarily in the business of owning and leasing single and multi-family real estate properties in Louisiana and Oregon. He also owns ninety-nine percent of the equity interests of Red Door Property Management LLC ("Red Door"), which manages at least some portion of the Debtor's properties. Red Door is a debtor-in-possession in a separate case pending in this Court (Case No. 11-02704-KMS).

**EXHIBIT 1**
**Page 42 of 100**

Chase is one of the Debtor's secured creditors by virtue of its ownership of some of the Debtor's mortgage indebtedness, and additionally services mortgage loans for two separate securitization trusts and the Federal National Mortgage Association, each of which are also secured creditors in this case.  In all, Chase has standing to appear in this case with respect to seven separate loans, each of which is secured by first priority liens on seven separate single family homes the Debtor holds for lease (the "Properties").  In addition to granting first priority liens on the Properties, the Debtor has assigned to Chase[1] all of the rents, profits and income generated from four of the Properties (the "Cash Collateral").  The Cash Collateral constitutes "cash collateral" under section 363 of the Code.

By this motion, Chase seeks an order under sections 361 and 363(e) of the Bankruptcy Code prohibiting the Debtor from using any of Chase's Cash Collateral and compelling the Debtor to immediately account for and turn over to Chase all rents and revenues that the Debtor (or his affiliates) have received from the Properties since the Petition Date (defined below).  Chase also seeks to compel the Debtor to provide it with current rent rolls and proof of adequate insurance coverage for each of the Properties.

In the alternative, Chase seeks an order lifting the automatic stay provided by section 362(a) of the Bankruptcy Code so that Chase may enforce its rights under its loan agreements with the Debtor.

2.

## JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This contested matter involves a motion to prohibit the use of Chase's cash collateral and for adequate

---

[1] Where the context requires, Chase means either JP Morgan Chase Bank, N.A. or the secured creditors whose loans Chase services.

EXHIBIT 1
Page 43 of 100

protection of Chase's interest in the same and other collateral, or in the alternative, for relief from automatic stay and, therefore, is a core proceeding pursuant to 28 U.S.C. § 157 (b)(2)(G) & (M).  The statutory basis for relief sought herein is provided by 11 U.S.C. §§ 361, 362(d), 363(e), and Fed. R. Bankr. P. 4001.

3.

## **BACKGROUND**

The Debtor filed his Voluntary Petition under Chapter 11 of the Bankruptcy Code on June 20, 2011 (the "Petition Date") and remains in possession and control of the estate's property as a "debtor in possession."

4.

The court has not appointed a committee of the Debtor's unsecured creditors, a trustee, or an examiner.

5.

The Debtor currently is indebted to Chase on seven separate loans, each of which is secured.  Each loan is secured by one Property; each Property secures only one loan.  Four of the seven secured loans also have the benefit of separate assignments of the leases and rents generated from the respective Properties securing them.

6.

## **Loan-1**

Chase is the holder, for the benefit of Federal National Mortgage Association ("Fannie Mae"), of the Debtor's promissory note dated January 24, 2002 in the original principal amount of ONE HUNDRED EIGHTY NINE THOUSAND SIX HUNDRED DOLLARS and 00/100 ($189,600.00), bearing interest at a fixed rate of 7.00% per annum, payable to the order of American Pacific Bank ("American") or any holder of the note, in regular monthly installments

3

**EXHIBIT 1**
**Page 44 of 100**

of principal and interest, with all outstanding principal and interest being due and payable on February 1, 2032 ("Note-1").  A copy of Note-1 is attached to this Motion as Exhibit "A."

7.

As security for his obligations under Note-1, the Debtor executed a "Deed of Trust," dated January 24, 2002 ("DOT-1"), granting American a first priority security interest in and to real property commonly known as 2335 Sunset Drive, Forest Grove, Oregon, 97116 (the "2335 Sunset Property"). The DOT-1 was duly recorded in the Washington County, Oregon, County Clerk's Office on January 29, 2002 as Instrument No. 2002-011000.  A copy of DOT-1 is attached to this Motion as Exhibit "B."

8.

As additional security for his obligations under Note-1, the Debtor executed a "1-4 Family Rider, Assignment of Rents" dated January 24, 2002, pursuant to which he absolutely and unconditionally assigned to American all rents and revenues generated from the 2335 Sunset Property ("Assignment-1").    Because Assignment-1 amended and supplemented DOT-1, Assignment-1 was duly recorded in the Washington County, Oregon, County Clerk's Office on January 29, 2002 as part of the DOT-1, Instrument No. 2002-011000.  A copy of Assignment-1 is attached to this Motion as part of Exhibit "B."  Note-1, DOT-1, Assignment-1 and any other ancillary documents executed in connection with them may be referred to collectively as "Loan-1."

9.

Shortly after closing Loan-1, American assigned all of its rights, title and interest in Loan-1 to Washington Mutual Bank, FA ("WAMU FA").   As evidence of this assignment, American, acting by and through its Vice President, James D. Harty, (a) endorsed Note-1

**EXHIBIT 1**
**Page 45 of 100**

"Without Recourse Pay to the Order of Washington Mutual Bank, FA," and (b) executed an "Assignment of Deed of Trust" in favor of WAMU FA, which was duly recorded in the Washington County, Oregon, County Clerk's Office on January 29, 2002 as Instrument No. 2002-011001.  A copy of the assignment is attached to this Motion as Exhibit "C."

10.

WAMU FA subsequently entered into an arrangement with Fannie Mae pursuant to which WAMU FA assigned all beneficial interests in Loan-1 to Fannie Mae with Fannie Mae, in turn, retaining WAMU FA and/or its affiliates to actually service and collect upon Loan-1.  As evidence of this transfer, WAMU FA, acting through its Assistant Secretary, Melissa Steven, endorsed Note-1 "Without recourse pay to the order of _____."

11.

On September 25, 2008, Chase purchased many of WAMU FA's banking operations from the receivership of the Federal Deposit Insurance Corporation. This purchase included the servicing rights in and to Loan-1.

12.

As servicer for Loan-1, Chase is the proper party to bring this Motion and represent the interests of Fannie Mae in Loan-1. Additionally, because WAMU FA endorsed Note-1 "in blank," Note-1 constitutes "bearer paper" under applicable law and Chase, as the holder of the Note-1 (for the benefit of Fannie Mae) may enforce Note-1 in accordance with its terms.

13.

As of the Petition Date, the Debtor was in payment default under Note-1.

14.

As of the Petition Date, the Debtor was indebted to Chase under Note-1 in the total amount of $229,224.51, comprised of an outstanding principal balance of $174,060.58, accrued contractual interest in the amount of $34,474.61, total fees and other charges in the amount of $7,362.29, and taxes and other escrow advances in the amount of $13,327.03.

15.

**Loan-2**

Chase is the holder in due course and owner for valuable consideration of the Debtor's promissory note dated June 30, 2004 in the original principal amount of NINETY-SIX THOUSAND DOLLARS and 00/100 ($96,000.00), bearing interest at a variable rate, payable to the order of Washington Mutual Bank ("WAMU") or any holder of the note, in regular monthly installments of principal and interest, with all outstanding principal and interest being due and payable on August 1, 2034 ("Note-2").  A copy of Note-2 is attached to this Motion as Exhibit "D."

16.

As security for his obligations under Note-2, the Debtor executed a "Deed of Trust," dated June 30, 2004 ("DOT-2") granting WAMU a first priority security interest in and to real property commonly known as 2809 22nd Avenue, Forest Grove, Oregon, 97116 (the "22nd Avenue Property"). The DOT-2 was duly recorded in the Washington County, Oregon, County Clerk's Office on July 7, 2004 as Instrument No. 2004-077597.  A copy of DOT-2 is attached to this Motion as Exhibit "E."

17.

As additional security for his obligations under Note-2, the Debtor executed a "1-4 Family Rider, Assignment of Rents" dated June 30, 2004, pursuant to which he absolutely and

6

**EXHIBIT 1**
**Page 47 of 100**

unconditionally assigned to WAMU all rents and revenues generated from the 22nd Avenue Property ("Assignment-2").   Because Assignment-2 amended and supplemented DOT-2, Assignment-2 was duly recorded in the Washington County, Oregon, County Clerk's Office on July 7, 2004 as part of the DOT-2, Instrument No. 2004-077597.  A copy of Assignment-2 is attached to this Motion as part of Exhibit "E."  Note-2, DOT-2, Assignment-2 and any other ancillary documents executed in connection with them may be referred to collectively as "Loan-2."

18.

On September 25, 2008, Chase purchased many of WAMU's banking operations from the receivership of the Federal Deposit Insurance Corporation.  This purchase included Loan-2. As evidence of this transfer, WAMU, acting by and through its First Vice President, Brenda Brendle, endorsed Note-2 "Pay to the order of _____ without recourse."

19.

WAMU's endorsement of Note-2 "in blank" makes Note-2 "bearer paper" under applicable law. Chase, as the holder of Note-2, may fully enforce Note-2 in accordance with its terms.

20.

As of the Petition Date, the Debtor was in payment default under Note-2.

21.

As of the Petition Date, the Debtor was indebted to Chase under Note-2 in the total amount of $95,436.75, comprised of an principal balance of $93,264.07, accrued contractual interest in the amount of $1,471.28, fees and other charges in the amount of $67.87, and taxes and other escrow items in the amount of $633.53.

**EXHIBIT 1**
**Page 48 of 100**

22.

**Loan-3**

Chase is the holder in due course and owner for valuable consideration of the Debtor's promissory note dated March 23, 2007 in the original principal amount of TWO HUNDRED THIRTEEN THOUSAND SEVEN HUNDRED FIFTY DOLLARS and 00/100 ($213,750.00), bearing interest at a hybrid rate per annum, payable to the order of Quicken Loans, Inc. ("Quicken") or any holder of the note, in regular monthly installments of principal and interest, with all outstanding principal and interest being due and payable on April 1, 2037 ("Note-3"). A copy of Note-3 is attached to this Motion as Exhibit "F."

23.

As security for his obligations under Note-3, the Debtor executed a "Deed of Trust" dated March 23, 2007 ("DOT-3") granting to Mortgage Electronic Registration Systems, Inc. ("MERS"), "as nominee for lender and lender's successors and assigns," a first priority security interest in and to real property commonly known as 2347 Sunset Drive, Forest Grove, Oregon, 97116 (the "2347 Sunset Property"). The DOT-3 was duly recorded in the Washington County, Oregon, County Clerk's Office on March 27, 2007 as Instrument No. 2007-033396. A copy of DOT-3 is attached to this Motion as Exhibit "G."

24.

As additional security for his obligations under Note-3, the Debtor executed a "1-4 Family Rider, Assignment of Rents" dated March 23, 2007, pursuant to which he absolutely and unconditionally assigned to Quicken all rents and revenues generated from the 2347 Sunset Property ("Assignment-3"). Because Assignment-3 amended and supplemented DOT-3, Assignment-3 was duly recorded in the Washington County, Oregon, County Clerk's Office on March 27, 2007 as part of the DOT-3, Instrument No. 2007-033396. A copy of Assignment-3 is

**EXHIBIT 1**
**Page 49 of 100**

attached to this Motion as part of Exhibit "G." Note-3, DOT-3, Assignment-3 and any other ancillary documents executed in connection with them may be referred to collectively as "Loan-3."

25.

Loan-3 was subsequently pooled by into a securitization trust commonly known as "Bear Sterns Mortgage Funding Trust series 2007-AR5" (the "Bear Sterns Trust"), and WAMU and/or its affiliates became the servicer of the loans in that Trust. As evidence of this transfer, Quicken, acting by and through its Capture Manager, Scott Johnson, endorsed Note-3 "Without Recourse Pay to the order of _____."

26.

On September 25, 2008, Chase purchased many of WAMU's banking operations from the receivership of the Federal Deposit Insurance Corporation, including the servicing obligations to Loan-3.

27.

As servicer for Loan-3, Chase is the proper party to bring this Motion and represent the interests of the Bear Sterns Trust in Loan-3. Additionally, because Quicken endorsed Note-3 "in blank," Note-3 constitutes "bearer paper" under applicable law and Chase, as the holder of the Note-3 (for the benefit of the Bear Sterns Trust) may enforce Note-3 in accordance with its terms.

28.

As of the Petition Date, the Debtor was in payment default under Note-3.

**EXHIBIT 1**
**Page 50 of 100**

29.

As of the Petition Date, Debtor is indebted to Chase under Note-3 in the total amount of $245,883.40, comprised of an outstanding principal balance of $239,330.00, fees and other charges in the amount of $578.36, and tax and other escrow advances in the amount of $5,975.04.

30.

**Loan-4**

Chase is the holder in due course and owner for valuable consideration of the Debtor's promissory note dated July 5, 2007 in the original principal amount of ONE HUNDRED FIFTY THOUSAND DOLLARS and 00/100 ($150,000.00), bearing interest at a hybrid rate, payable to the order of Eustis Mortgage Corporation ("Eustis") or any holder of the note, in regular monthly installments of principal and interest, with all outstanding principal and interest being due and payable on August 1, 2037 ("Note-4").  A copy of Note-4 is attached to this Motion as Exhibit "H."

31.

As security for his obligations under Note-3, the Debtor executed a "Mortgage" dated July 5, 2007 (the "Mortgage"), granting to MERS, "as nominee for lender and lender's successors and assigns," a first priority mortgage in and to immovable property commonly known as 4737 Venus Street, New Orleans, LA 70122 (the "Venus Street Property"). The Mortgage was duly recorded in Notarial Archives for Orleans Parish, Louisiana on July 11, 2007 as Instrument No. 2007-48089 and additionally recorded with the Recorder of Mortgages for Orleans Parish, Louisiana on July 11, 2007 as Instrument No. 905499.  A copy of the Mortgage is attached to this Motion as Exhibit "I."

10

**EXHIBIT 1**
**Page 51 of 100**

32.

As additional security for his obligations under Note-4, the Debtor executed a "1-4 Family Rider, Assignment of Rents" dated July 5, 2007, pursuant to which he absolutely and unconditionally assigned to Eustis all rents and revenues generated from the Venus Street Property ("Assignment-4"). Because Assignment-4 amended and supplemented the Mortgage, Assignment-4 was duly recorded as part of that Mortgage in the Notarial Archives and Mortgage Records as noted above. A copy of Assignment-4 is attached to this Motion as part of Exhibit "I." Note-4, the Mortgage, Assignment-4 and any other ancillary documents executed in connection with them may be referred to collectively as "Loan-4."

33.

On or about August 15, 2011, MERS, acting as nominee for Eustis, executed a "Notarial Endorsement and Assignment of Mortgage Note," pursuant to which it assigned all of its right, title and interest in Note-4 to Chase. That assignment was duly recorded in the Notarial Archives for Orleans Parish, Louisiana on August 15, 2011 as Instrument No. 2011-29623 and additionally recorded with the Recorder of Mortgages for Orleans Parish, Louisiana on August 15, 2011 as Instrument No. 1062162. A copy of this assignment is attached to this Motion as Exhibit "J." As further evidence of the assignment, Eustis, acting by and through its Vice President, Jennifer Fortier, endorsed Note-4 "Pay to the Order of JP Morgan Chase Bank, NA Without Recourse."

34.

Pursuant to Louisiana Civil Code Article 2645, the assignment of Note-4 includes all of its accessory rights, such as security rights. Thus, all documents evidencing security rights and

**EXHIBIT 1**
**Page 52 of 100**

agreements securing Note-4 and all collateral interests were assigned to Chase pursuant to the assignment referenced above.

35.

Prior to the Petition Date, the Debtor defaulted under Note-4 by failing to make his regularly scheduled payments under the same.

36.

Consequently, Chase instituted foreclosure proceedings against the Debtor in order to seize and sell the Venus Street Property.  However, those foreclosure proceedings became stayed on the Petition Date.

37.

As of the Petition Date, the Debtor was indebted to Chase under Note-4 in the total amount of $191,224.89, comprised of an outstanding principal balance of $148,130.86, accrued interest in the amount of $28,334.53, charges and other fees in the amount of $5,835.13, tax and other escrow advances in the amount of $9,556.66, and subject to a credit for $632.29 held in a suspense account.

38.

## **Loan-5**

Chase is the holder in due course and owner for valuable consideration of the Debtor's promissory note dated May 19, 1999 in the original principal amount of ONE HUNDRED THIRTY TWO THOUSAND DOLLARS and 00/100 ($132,000.00), bearing interest at a variable rate, payable to the order of WAMU or any holder of the note, in regular monthly installments of principal and interest, with all outstanding principal and interest being due and payable on June 1, 2029 ("Note-5").  A copy of Note-5 is attached to this Motion as Exhibit "K."

**EXHIBIT 1**
**Page 53 of 100**

39.

As security for his obligations under Note-5, the Debtor executed a "Deed of Trust," dated May 19, 1999 ("DOT-5"), granting WAMU a first priority security interest in and to real property commonly known as 17762 Mardee Avenue, Lake Oswego, Oregon, 97035 (the "Mardee Property"). The DOT-5 was duly recorded in the Clackamas County, Oregon, County Clerk's Office on May 21, 1999 as Instrument Number 99-051814.  A true and correct copy of DOT-5 is attached to this Motion as Exhibit "L."  Note-5, DOT-5 and any other ancillary documents executed in connection with them may be referred to collectively as "Loan-5."

40.

The Debtor did not assign the rents and revenues from the Mardee Property to WAMU as additional collateral security for Loan-5, most likely because when he applied for Loan-5, the Debtor represented to WAMU that he would use the Mardee Property solely as his primary residence.  Chase believes that the Debtor never used the Mardee Property as his primary residence.

41.

On September 25, 2008, Chase purchased many of WAMU's banking operations from the receivership of the Federal Deposit Insurance Corporation.  This purchase included Loan-5.

42.

On or about February 16, 2011, the Debtor and Chase entered into a Loan Modification Agreement, pursuant to which the maturity date of Note-5 was extended to June 1, 2032 and the variable rate under Note-5 was fixed at 4.0%.  A copy of this Loan Modification is attached to this Motion as Exhibit "M."

EXHIBIT 1
Page 54 of 100

43.

Shortly after he entered into the Loan Modification the Debtor defaulted on payments under Note-5.  As of the Petition Date, the Debtor was in payment default under Note-5.

44.

As of the Petition Date, the Debtor was indebted to Chase under Note-5 in the total amount of $111,138.15, comprised of an outstanding principal balance of $109,246.47, accrued contractual interest in the amount of $1,003.66, late fees and other charges in the amount of $150.82, and taxes and other escrow advances in the amount of $737.20.

45.

**Loan-6**

Chase is the holder in due course and owner for valuable consideration of the Debtor's promissory note dated September 25, 2006 in the original principal amount of ONE HUNDRED TWENTY TWO THOUSAND SEVEN HUNDRED FIFTY-TWO DOLLARS and 00/100 ($122,752.00), bearing interest at a fixed rate of 6.50% per annum, payable to the order of WAMU FA or any holder of the note, in regular monthly installments of principal and interest, with all outstanding principal and interest being due and payable on October 1, 2036 ("Note-6"). A copy of Note-6 is attached to this Motion as Exhibit "N."

46.

As security for his obligations under Note-6, the Debtor executed a "Deed of Trust," dated September 25, 2006 ("DOT-6") granting WAMU FA a first priority security interest in and to real property commonly known as 7045 Otter Crest Loop, Unit # 11, Otter Rock, Oregon, 97369 (the "Otter Crest Property"). The DOT-6 was duly recorded in the Lincoln County, Oregon, County Clerk's Office on November 17, 2006 as Instrument Number 200617588. A true and correct copy of DOT-6 is attached to this Motion as Exhibit "O."

EXHIBIT 1
Page 55 of 100

47.

In addition, the Debtor executed a "Second Home Rider" to DOT-6 on September 25, 2006, in which he represented to WAMU FA that he would use the Otter Crest Property solely as his second home and would not rent the Otter Crest Property to any third party.  Because the Second Home Rider amended and supplemented DOT-6, it was duly recorded as part of the same, as described above.  A copy of the Second Home Rider is attached hereto as part of Exhibit "O."  Note-6, DOT-6, the Second Homer Rider and any other ancillary documents executed in connection with them may be referred to collectively as "Loan-6."

48.

The Debtor did not assign the rents and revenues from the Otter Crest Property to WAMU FA as additional collateral security for Loan-6, most likely because of his representation in the Second Home Rider that we would use the Otter Crest Property solely as his second home and would not hold it out for rent.  Chase believes that the Debtor never used the Otter Crest Property as his second residence.

49.

On September 25, 2008, Chase purchased many of WAMU's banking operations from the receivership of the Federal Deposit Insurance Corporation, including Loan-6.  As evidence for this transfer, WAMU FA, acting by and through its Vice President, Cynthia A. Riley, endorsed Note-6 "Pay to the Order of _____ Without Recourse."

50.

WAMU FA's endorsement of Note-6 "in blank" makes Note-6 "bearer paper" under applicable law.  Chase, as holder of Note-6, has the right to fully enforce Note-6 in accordance with its terms.

15

**EXHIBIT 1**
**Page 56 of 100**

51.

As of the Petition Date, the Debtor was in payment default under Note-6.

52.

As of the Petition Date, the Debtor was indebted to Chase under Note-6 in the total amount of $154,446.66 comprised of an outstanding principal balance of $119,840.84, accrued interest in the amount of $21,848.45, charges and other fees in the amount of $9,804.21, tax and lien advances in the amount of $3,477.27, and unapplied funds being held in suspense in the amount of ($524.11).

53.

**Loan-7**

Chase is the holder in due course and owner for valuable consideration of the Debtor's promissory note dated November 3, 2004 in the original principal amount of TWO HUNDRED FIFTY TWO THOUSAND DOLLARS and 00/100 ($252,000.00), bearing interest at a variable rate, payable to the order of WAMU or any holder of the note, in regular monthly installments of principal and interest, with all outstanding principal and interest being due and payable on December 1, 2034 ("Note-7").  A copy of Note-7 is attached to this Motion as Exhibit "P."

54.

As security for his obligations under Note-7, the Debtor executed a "Deed of Trust" dated November 3, 2004 ("DOT-7") granting WAMU a first priority security interest in and to real property more commonly known as 1327 Primrose Lane, Forest Grove, Oregon, 97116 (the "Primrose Property"). DOT-7 was duly recorded in the Washington County, Oregon, County Clerk's Office on November 8, 2004 as Instrument Number 2004-128621.  A true and correct copy of DOT-7 is attached to this Motion as Exhibit "Q."  Note-7, DOT-7 and any other

16

**EXHIBIT 1**
**Page 57 of 100**

ancillary documents executed in connection with them may be referred to collectively as "Loan-7."

### 55.

The Debtor did not assign the rents and revenues from the Primrose Property to WAMU as additional collateral security for Loan-7, most likely because when he applied for Loan-7, the Debtor represented to WAMU that he would use the Primrose Property solely as his primary residence.  Chase believes that the Debtor never used the Primrose Property as his primary residence.

### 56.

Loan-7 was subsequently pooled by into a securitization trust commonly known as "WAMU series 2005-PR1" (the "WAMU Trust"), and WAMU and/or its affiliates became the servicer of the loans in that Trust.  As evidence for this transfer, WAMU, acting by and through its Assistant Vice President, Leta Hutchinson, did endorse Note-7 "Pay to the Order of _____ Without Recourse."

### 57.

On September 25, 2008, Chase purchased many of WAMU's banking operations from the receivership of the Federal Deposit Insurance Corporation, including the servicing obligations to Loan-7.

### 58.

As servicer for Loan-7, Chase is the proper party to bring this Motion and represent the interests of the WAMU Trust in Loan-7.  Additionally, because WAMU endorsed Note-7 "in blank," Note-7 constitutes "bearer paper" under applicable law and Chase, as the holder of the Note-7 (for the benefit of the WAMU Trust) may enforce Note-7 in accordance with its terms.

**EXHIBIT 1**
**Page 58 of 100**

59.

As of the Petition Date, the Debtor was in payment default under Note-7.

60.

As of the Petition Date, the Debtor was indebted to Chase under Note-7 in the total amount of $307,597.04, comprised of an outstanding principal balance of $270,596.40, accrued interest in the amount of $20,741.12, fees and other charges in the amount of $5,781.07, and tax and other escrow advances in the amount of $11,373.35, and subject to a credit for $894.90 held in a suspense account.

61.

**<u>Post-Petition Defaults</u>**

As Chase will demonstrate at the hearing on this Motion, the Debtor has, upon information and belief, additionally defaulted under the Loans by actively breaching various provisions of the loan documentation evidencing the same.

62.

For instance, the Debtor has breached its obligation to hold all rents in trust for Chase's sole benefit, and otherwise to permit Chase to recover those rents and apply them to the outstanding balances owed on the Loans Nos. 1-4.

63.

The Debtor also may be in default of his obligation to procure and maintain adequate rent loss insurance as required under Section D of each of the "1-4 Family Rider, Assignment of Rents" related to Loan Nos. 1-4.   Similarly, the Debtor may be in default of his obligations to insure the Properties against casualty and loss, as the Loan Documents require.

64.

As of the filing of this Motion, Chase is unaware of the operative facts with respect to each of these (and other) issues but will develop them in advance of or at the hearing on this Motion.

65.

**Prohibition on Use of Cash Collateral and Adequate Protection related to Same**

The Rents generated by the Properties securing Loan Nos. 1-4 are cash collateral under section 363 of the Bankruptcy Code, and secure the Debtor's performance under each of those Loans (previously identified as the "Cash Collateral").

66.

As of the date of this Motion (more than 9 months after the Debtor sought relief under the Code), the Debtor has neither sought nor obtained this Court's permission to utilize the Cash Collateral in the operation of his business, and Chase does not consent to that use.  Accordingly, as a matter of law, Bankruptcy Code section 363(c) prohibits the Debtor from using the Cash Collateral.

67.

Nevertheless, since the Petition Date the Debtor has used, and continues to use, the Cash Collateral.

68.

Furthermore, the Debtor is not being candid with this Court or his creditors about the true amount of his monthly income or expenses.  Indeed, the Debtor claims to own and lease numerous single family homes and apartment complexes throughout Louisiana and Oregon. Those properties generate a large amount of rental income for the Debtor and cost thousands of

19

**EXHIBIT 1**
**Page 60 of 100**

dollars to operate.[2]  Yet, the Debtor's Monthly Operating Reports reflect none of those expenses or rental income; instead, the Debtor only discloses something he refers to as his "NET INCOME" minus additional expenses for miscellaneous food items, personal effects, and veterinary bills.

69.

Equally unclear is who is actually collecting (and spending?) the monthly rental income the Properties generate.  According to the Debtor's Monthly Operating Report for August 2011 through October 2011, his only source of revenue was "rental income," "payroll income," and/or other "income" from Red Door (his bankrupt management company) and Fircones LTD (another company the Debtor owns).  Yet, the Debtor's January, 2012 Monthly Operating Report declares that he received "income" from "Stancorp, IRS, Payroll, Dhap, and Magnolia EPA."  No longer does the Debtor reference any "income" from Red Door or Fircones.  In addition, the Debtor's Monthly Operating Reports show numerous disbursements to a "Stephanie Knoth" and "Katie Windham."  Again, the Debtor makes no attempt to disclose the nature of his relationship with these individuals, much less the terms on which these disbursements are made.

70.

Considering this and other disclosures by the Debtor and Red Door, it appears that a large portion of the Debtor's rental income may be flowing to or through Red Door, Fircones LTD, other affiliated companies, and/or third parties.  Where those funds ultimately are going is not clear.  What is clear, however, is that the Debtor has neither sought nor obtained this Court's authorization to manage his cash in this manner and relieve himself of the accountability the Bankruptcy Code requires.

---

[2] See Budgets attached to Debtor's Emergency Motions for Use of Cash Collateral, [DOC. 140] and [DOC. 154]

20

**EXHIBIT 1**
**Page 61 of 100**

71.

Given the foregoing state of affairs, Chase believes it is at risk of being left without any Cash Collateral unless this Court orders the Debtor to stop using the Cash Collateral and, as adequate protection, further orders the Debtor to segregate and deposit any Cash Collateral in his possession (or the possession of his business affiliates) into an escrow account to be maintained at Chase and controlled by Chase pending the administration of this Case (the "Escrow Account").

72.

Under the various Assignment of Rents securing Loans 1-4, the Debtor has authorized Chase to "collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender. . .".  Consequently, in further protection of Chase's Cash Collateral, Chase requests that it be authorized to immediately notify and instruct all tenants of the Properties securing Loans 1-4 to make any and all future rental payments to Chase, which funds shall also be held in the Escrow Account.

73.

Chase also requests, as additional adequate protection, that the Court order the Debtor to provide Chase with immediate access to the Debtor's business records, including without limitation any and all tax returns (filed or un-filed), profit and loss statements, cash flow analyses, balance sheets, income statements and rents rolls for the Debtor and each of his affiliated companies.

**EXHIBIT 1**
**Page 62 of 100**

74.

**Conditional Use of Properties and Other Adequate Protection**

As noted above, the Debtor is delinquent on all of the Loans and, in some instances, is many months in arrears.  Yet, as also noted above, the Debtor is actively collecting rents on each of the Properties without affording any accountability to Chase.

75.

Hence, on the grounds set forth above, the Debtor's continued use of all of the Properties should be conditioned on him providing basic protection of Chase's security interests therein. Specifically, Chase requests that this Court order the Debtor to:

    A.    immediately pay the past due arrears that have accrued on each of the Loans since the Petition Date;

    B.    enter into a repayment program with Chase in order to cure any and all pre-Petition arrears that may be owed on the Loans;

    C.    provide adequate assurance to Chase that the Debtor will make all future payments owed under the Loan Documents and/or any arrearage repayment program (as the case may be) on a timely basis;

    D.    provide proof that each Property is properly insured up to the value of the same;

    E.    grant Chase a super-priority administrative expense claim to the extent the adequate protection granted is inadequate; and/ or

    F.    grant Chase such other protection as this Court may deem appropriate that will grant to Chase the indubitable equivalent of the value of Chase's security interests in the Properties and Cash Collateral.

76.

**Relief from the Automatic Stay**

As an alternative to the adequate protection regime Chase has requested above, Chase requests relief from the automatic stay imposed under section 362(a) of the Bankruptcy Code. Pursuant to 11 U.S.C. § 362 (d)(1), upon the request of a party in interest and after notice and

22

**EXHIBIT 1**
**Page 63 of 100**

hearing, the Court "shall grant" relief from the automatic stay with respect to property for "cause."

77.

As the following chart demonstrates, a comparison of the Debtor's own property valuations[3] to the amounts owed on each of the Loans as of the Petition Date demonstrates the Debtor lacks equity in most of the Properties and that Chase is likely under-secured with respect to at least six of its seven secured Loans:

| Property Description | Debtor's Valuation (per Schedules) | Payoff Amount (as of Petition Date) |
|---|---|---|
| 2335 Sunset Drive | $ 124,765.00 | $ 229,224.51 |
| 2809 22nd Avenue | $ 82,000.00 | $ 95,436.75 |
| 2347 Sunset Drive | $ 135,000.00 | $ 245,883.40 |
| 4737 Venus Street | $ 90,000.00 | $ 191,224.89 |
| 17762 Mardee Avenue | $ 175,000.00 | $ 111,138.15 |
| 7045 Otter Crest Loop | $ 83,820.00 | $ 154,446.66 |
| 1327 Primrose Lane | $ 206,000.00 | $ 307,597.04 |

78.

Moreover, since the commencement of this case, an aggregate of $89,611.21 in regularly scheduled payments have become due on the Loan but the Debtor has not made any portion of those payments. The following chart shows, for each Loan the monthly payment amount and the aggregate amount of payments missed during this case.

| Property Description | Scheduled Monthly Payment Amount | Aggregate Unpaid Payments During This Case |
|---|---|---|
| 2335 Sunset Drive | $ 1,610.57 | $ 16,105.70 |
| 2809 22nd Avenue | $ Various | $ 6,681.51 |
| 2347 Sunset Drive | $ Various | $ 17,390.98 |
| 4737 Venus Street | $ Various | $ 14,140.54 |

---

[3] Chase reserves the right to conduct its own valuation analysis on each Property and does not, in any way, stipulate to the correctness of the Debtor's valuations, further reserving the right to specifically challenge the same at a later date. Reference to the Debtor's valuations is made simply to demonstrate to this Court that, on a preliminary basis at least, it does not appear that any equity exists in the Properties and that some portion of Chase's Loans are under-secured.

23

**EXHIBIT 1**
**Page 64 of 100**

| 17762 Mardee Avenue | $ | Various | $ | 10,372.23 |
|---|---|---|---|---|
| 7045 Otter Crest Loop | $ | Various | $ | 8,431.95 |
| 1327 Primrose Lane | $ | 1,648.83 | $ | 16,488.30 |
| Total Scheduled Post-Petition Payments Not Paid | | | $ | 89,611.21 |

79.

In addition, each of the Properties securing a Loan is rental property and, upon information and belief, is subject to continuous depreciation, wear and tear, and other damage. As a result, the Properties are constantly depreciating in value and, consequently, Chase's collateral interests are constantly eroding.

80.

As mentioned above, the Debtor has not demonstrated that the Properties are properly and adequately insured against casualty and other losses. Hence, Chase's collateral interests may be in further jeopardy.

81.

The Debtor's Monthly Operating Reports show little likelihood of a successful reorganization of the Debtor's business. This case has been pending for nearly ten months, yet the Debtor has made little or no discernable effort to reorganize his business and properties. To the contrary, he has sought two extensions of his exclusive period to file a plan of reorganization but never has communicated to this Court or his creditors a cogent explanation of the business fundamentals upon which he might base a plan. In the meantime, as of January 31, 2012, the Debtor apparently had managed to generate positive monthly cash flow only twice since the Petition Date; cash flow which apparently does not take into account the Debtor's monthly debt service obligations to Chase or his other secured creditors.

82.

Until the Debtor fully discloses all of his sources of income and all of the expenses associated with his businesses and those of his affiliated companies, it is impossible to know whether any of the Properties actually are necessary for an effective reorganization.  Any assertion by the Debtor that the Properties are somehow "necessary" for an effective reorganization are, at this point, self-serving and unsubstantiated.

83.

More than sufficient "cause" exists in this case to warrant a relief from stay.  To begin with, the Debtor has waived off his disclosure obligations under the Bankruptcy Code and failed to make his regular payments on each of the Loans for many months.  Without any adequate protection or relief from the automatic stay, Chase will be left without any remedy at law and will suffer real, irreparable injury.

84.

Chase additionally asserts that sufficient cause exists to support a waiver of Rule 4001(a)(3) so that Chase may proceed immediately to enforce any order granting it relief from the automatic stay.

**WHEREFORE**, JP Morgan Chase Bank, N.A. respectfully requests that this Court enter an Order,

A.      prohibiting the Debtor's use of the Cash Collateral and as adequate protection:

1.      the Debtor be ordered to immediately segregate and deposit any Cash Collateral in his possession (or in the possession of his business affiliates) into the Escrow Account;

2.      Chase be authorized to immediately notify and instruct all tenants of the Properties securing Loans 1-4 to make any and all future rental payments to Chase, which funds shall also be held in the Escrow Account, and;

**EXHIBIT 1**
**Page 66 of 100**

      3.      the Debtor be ordered to provide Chase with immediate access to the Debtor's business records, including without limitation any and all tax returns (filed or un-filed), profit and loss statements, cash flow analyses, balance sheets, income statements and rents rolls for the Debtor and each of his affiliated companies;

B.      conditioning the Debtor's use of the Properties on the Debtor providing the following additional adequate protection to Chase:

      1.      immediately paying the past due arrears that have accrued on each of the Loans since the Petition Date;

      2.      entering into a repayment program with Chase in order to cure any and all pre-Petition arrears that may be owed on the Loans;

      3.      providing adequate assurance to Chase that the Debtor will make all future payments owed under the Loan Documents and/or any arrearage repayment program (as the case may be) on a timely basis;

      4.      providing proof that each Property is properly insured up to the value of the same;

      5.      granting Chase a super-priority administrative expense claim to the extent the adequate protection granted is inadequate; and/ or

      6.      granting Chase such other protection as this Court may deem appropriate that will grant to Chase the indubitable equivalent of the value of Chase's security interests in the Properties and Cash Collateral.

C.      alternatively, in the event that this Court does grant Chase the adequate protection requested herein or should the Debtor fail to provide the same, then pursuant to 11 U.S.C. §362(d) granting Chase relief from the automatic stay so as to permit Chase to repossess, foreclose or otherwise realize upon its collateral and bring an action in accordance with state law as may be necessary to put Chase and/or persons acting on its behalf in full and complete possession of the collateral;

D.      further granting relief to Chase to provide that such stay relief shall be applicable to any subsequent case filed by or against the Debtor under the Bankruptcy Code;

E.      or in the alternative, granting Chase such other and further relief as the Court deems just and proper, and;

**EXHIBIT 1**
**Page 67 of 100**

    F.      that the time provisions of Rule 4001(a)(3) be waived and Chase allowed to immediately enforce any order entered granting it relief from the automatic stay.

Respectfully submitted,

**JPMORGAN CHASE BANK, N.A.**


By:    s/ Stephen T. Masley
          Stephen T. Masley
          One of Its Attorneys


**OF COUNSEL**:

Stephen T. Masley (MSB # 101870)
**McGLINCHEY STAFFORD PLLC**
Suite 1100, City Centre South
200 South Lamar Street (Zip - 39201)
Post Office Box 22949
Jackson, Mississippi  39225-2949
Telephone:  (601) 960-8400
Facsimile:  (601) 960-8431
Email: smasley@mcglinchey.com

and

E. Stewart Spielman (LA Bar Roll # 28766)
Brad J. Axelrod (LA Bar Roll # 24286)
**McGlinchey Stafford, PLLC**
One American Place, Fourteenth Floor
Baton Rouge, Louisiana 70825
Telephone: (225) 383-9000
Facsimile:  (225) 343-3076
Email:  sspielman@mcglinchey.com
        baxelrod@mcglinchey.com

*Attorneys for JP Morgan Chase Bank, N.A.,*
*in its individual capacity and as servicer for*
*certain mortgage loan securitization trusts*

**EXHIBIT 1**
**Page 68 of 100**

## <u>CERTIFICATE OF SERVICE</u>

I, the undersigned Stephen T. Masley, McGlinchey Stafford PLLC, hereby certify that on this day, I electronically filed the foregoing *Motion Under 11 U.S.C. §§ 361 and 363(E) to Prohibit Use of Cash Collateral and for Adequate Protection, or in the Alternative, for Relief from the Automatic Stay* with the Clerk of the Court using the ECF system, which sent notification of such filing to the following:

R. Cory Anthony - notifications@underwoodlawfirm.com
bankruptcies@underwoodlawfirm.com

Robert Alan Byrd - rab@byrdwiser.com  wrs@byrdwiser.com

Raymond Spencer Clift - sclift@bakerdonelson.com  sloft@bakerdonelson.com
elindner@bakerdonelson.com

Craig M. Geno - cmgeno@cmgenolaw.com  adavis@cmgenolaw.com
bpritchard@cmgenolaw.com  htrammell@cmgenolaw.com
reception@cmgenolaw.com

Deetric M Hicks - ECF_MS@prommis.com  dmhicks@jflegal.com

Michael Alan Jedynak - ecf@ms.creditorlawyers.com

Evan Joseph Lundy - msbankruptcy@logs.com

Margot D Lutzenhiser - mlutzenhiser@fwwlaw.com  dhitti@fwwlaw.com

Russell Scott Manning - rsm@byrdwiser.com  spn@byrdwiser.com

J. Gary Massey - MSBankruptcy@LOGS.com

Paul S. Murphy - paul.murphy@butlersnow.com  kitty.logan@butlersnow.com
ecf.notices@butlersnow.com

Harold B Scoggins - hscoggins@fwwlaw.com  jburney@fwwlaw.com

Sean Albert Southern - sean.southern@ms.creditorlawyers.com
ecf@ms.creditorlawyers.com  acox@ms.creditorlawyers.com
pgonzales@ms.creditorlawyers.com

Christopher James Steiskal - Christopher.J.Steiskal@usdoj.gov

28

**EXHIBIT 1
Page 69 of 100**

United States Trustee  - USTPRegion05.JA.ECF@usdoj.gov

William P. Wessler -  wwessler@cableone.net

and I hereby certify that I have mailed by United States Postal Service the document to the following non-ECF participants:

NONE


This the 5th day of April, 2012.


s/ Stephen T. Masley
Of Counsel

29

**EXHIBIT 1**
**Page 70 of 100**

| Washington County, Oregon<br>**D-MA**<br>Stn=19 Y LOPEZ<br>$5.00 $11.00 $5.00 $15.00 | **2013-022953**<br>**03/14/2013 08:35:02 AM**<br><br>**$36.00** |
|---|---|

I, Richard Hobernicht, Director of Assessment and Taxation and Ex-
Officio County Clerk for Washington County, Oregon, do hereby
certify that the within instrument of writing was received and
recorded in the book of records of said county.

Richard Hobernicht, Director of
Assessment and Taxation, Ex-Officio

When Recorded Return To:
JPMorgan Chase Bank, NA
C/O NTC 2100 Alt. 19 North
Palm Harbor, FL 34683
Loan #: 8464645145

## CORPORATE ASSIGNMENT OF DEED OF TRUST

Contact JPMORGAN CHASE BANK, N.A. for this instrument 780 Kansas Lane, Suite A, Monroe, LA 71203, telephone # (866) 756-8747, which is responsible for receiving payments.
FOR GOOD AND VALUABLE CONSIDERATION, the sufficiency of which is hereby acknowledged, the undersigned, **FEDERAL DEPOSIT INSURANCE CORPORATION, AS RECEIVER OF WASHINGTON MUTUAL BANK F/K/A WASHINGTON MUTUAL BANK, FA, WHOSE ADDRESS IS 700 Kansas Lane, MC 8000, MONROE, LA, 71203, (ASSIGNOR),** by these presents does convey, grant, assign, transfer and set over the described Deed of Trust with all interest secured thereby, all liens, and any rights due or to become due thereon to **JPMORGAN CHASE BANK, NATIONAL ASSOCIATION, WHOSE ADDRESS IS 700 Kansas Lane, MC 8000, MONROE, LA 71203 (866)756-8747, ITS SUCCESSORS OR ASSIGNS, (ASSIGNEE).**

Said Deed of Trust dated 01/24/2002, and executed by **JOEL GROSHONG** whose address is 2335 SUNSET DRIVE, FOREST GROVE, OR 97116 to **AMERICAN PACIFIC BANK** and recorded on 01/29/2002 in Book n/a, Page n/a, as Instrument # 2002-011000 in the office of the Recorder of WASHINGTON County, Oregon.

This Assignment is made without recourse, representation or warranty, express or implied, by the FDIC in its corporate capacity or as Receiver.

This Assignment is intended to further memorialize the transfer that occured by operation of law on September 25, 2008 as authorized by Section 11(d)(2)(G)(i)(II) of the Federal Deposit Insurance Act, 12 U.S.C. S1821 (d)(2)(G)(i)(II)

IN WITNESS WHEREOF, this Assignment is executed on _03 / 08_ /2013 (MM/DD/YYYY)
FEDERAL DEPOSIT INSURANCE CORPORATION, AS RECEIVER OF WASHINGTON MUTUAL BANK F/K/A WASHINGTON MUTUAL BANK, FA, by JPMORGAN CHASE BANK, NATIONAL ASSOCIATION, its Attorney-in-Fact

By: 
Katasha Gilbert
**VICE PRESIDENT**

STATE OF LOUISIANA   PARISH OF OUACHITA
On _03 / 08_ /2013 (MM/DD/YYYY), before me appeared _Katasha Gilbert_, to me personally known, who did say that he/she/they is/are the VICE PRESIDENT of JPMORGAN CHASE BANK, NATIONAL ASSOCIATION as Attorney-in-Fact for FEDERAL DEPOSIT INSURANCE CORPORATION, AS RECEIVER OF WASHINGTON MUTUAL BANK F/K/A WASHINGTON MUTUAL BANK, FA and that the instrument was signed on behalf of the corporation (or association), by authority from its board of directors, and that he/she/they acknowledged the instrument to be the free act and deed of the corporation (or association).

Y. K. Wilson
Notary Public - State of LOUISIANA
Commission expires: Upon My Death

Y. K. WILSON
OUACHITA PARISH, LOUISIANA
LIFETIME COMMISSION
NOTARY ID# 064399

Prepared By: E.Lance/NTC, 2100 Alt. 19 North, Palm Harbor, FL 34683 (800)346-9152
JPCAS 19518902 -_ WAMU CJ4723520  T0113033115  [C] FRMOR1_JPCAS3

*19518902*

**EXHIBIT 1**
**Page 71 of 100**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## JACKSON DIVISION

IN RE:                                          CHAPTER 11 PROCEEDING
JOEL C GROSHONG, DEBTOR                          CASE NO. 11-02179-KMS

JPMORGAN CHASE BANK, NATIONAL ASSOCIATION                    PLAINTIFF

VS.

JOEL C GROSHONG                                             DEFENDANT

### MOTION FOR RELIEF FROM AUTOMATIC STAY
### AND FOR OTHER RELIEF

COMES NOW, JPMorgan Chase Bank, National Association, a party in interest in this cause, by and through its attorney, and moves this Court to lift the automatic stay as to certain property of the Debtor, and for other relief, and in support of said motion would respectfully show unto the Court the following to wit:

I.

That on or about June 20, 2011, the above named Debtor filed a voluntary petition in Bankruptcy pursuant to 11 U.S.C. Chapter 11.  By operation of 11 U.S.C. 362, the Plaintiff is prohibited from commitment of any judicial proceeding against the Defendant, any act to obtain possession of property of the estate, or any act to enforce any lien against the property of the estate.

II.

That the Bankruptcy Court has jurisdiction over this proceeding pursuant to 11 U.S.C. 362.

**EXHIBIT 1**
**Page 72 of 100**

III.

That on or about January 24, 2002, Joel Groshong, did execute a certain Deed of Trust

Note and Deed of Trust in favor of American Pacific Bank and secured by the following real

property:

> A parcel of land situated in the William B. Stokes Donation Land Claim No. 61, in
> Section 31, Township1 North, Range 3 West, of the Williamette Meridian, in the City of
> Forest Grove, County of Washington and State of Oregon, more particularly described as
> follows:
>
> Beginning at the Southeast corner of that parcel conveyed to Eugene D. Revier, et ux, by
> Deed recorded December 10, 1971 Book 846, Page 526. Film Records, in the County of
> Washington and State of Oregon, the said Southeast corner being South 89 degrees 33
> minutes East 92.35 feet and South 00 degrees 24 minutes West 75 feet from the
> intersection of the South line of 24th Avenue and the Easterly line of Sunset Drive;
> thence Southwesterly  along the Easterly line of Sunset Drive 125.00 feet, more or less to
> the Southwest corner of Lot 8, Block 3 of CURTIS ADDITION TO THE CITY OF
> FOREST GROVE; thence East along the South lines of Lots 8 and 7 of said Block 3 a
> distance of 130 feet to a point South 00 degrees 24 minutes West from the point of
> beginning; thence North 00 degrees 24 minutes East 125.00 feet, more or less. to the
> point of beginning.

Said Deed of Trust is recorded in the Washington County Chancery Clerk's office as Instrument

No. 2002-011000.  JPMorgan Chase Bank, National Association, services the loan on the

property referenced in this Motion for Relief.  In the event the automatic stay in this case is

lifted/set aside, this case dismisses, and/or the debtor obtains a discharge and a foreclosure action

is commenced on the mortgaged property, the foreclosure will be conducted in the name of

JPMorgan Chase Bank, National Association.  Said entity, directly or through an agent, has

possession of the promissory note.  The promissory note is either made payable to said entity or

has been duly endorsed.

IV.

That the Defendant has defaulted his obligations under the  Confirmed Plan [dkt. 591],

which specifically provided that the claims secured by the property located at 2335 Sunset Drive,

**EXHIBIT 1**
**Page 73 of 100**

Forest Grove, Oregon would  be paid such that the pre-petition arrearages would be capitalized over the period of amortization, and the obligation would be paid in equal monthly installments over the amortization period, to become due and payable in five years at the interest rate of 5% per annum.

## V.

The Order Confirming Plan [dkt. 591] further provided that should the Debtor default on its obligations to Chase, that Chase would be entitled to obtain title to the collateral, including without limitation by:

a. Debtor voluntarily conveying title to the Chase Collateral, or any portion of the Chase Collateral, by *dation en paiement* and/or deed in lieu of foreclosure, while reserving a deficiency by Chase against the Debtor and any guarantor of the obligations of the Debtor to Chase; or

b. At Chase's option, the Debtor shall immediately allow and consent to Chase foreclosing upon the Chase Collateral, and to exercise all of its rights and remedies as a creditor and shall execute an and all documents and pleadings requested by Chase in connection with such foreclosures.

## VI.

Chase has not received any payments from the Debtor, regarding the loan that is the subject of this Motion, since the confirmation of the Plan in this case.

## VII.

Plaintiff would show that sufficient cause exists for the termination, annulment or modification of the automatic stay as provided in 11 U.S.C.362 (d) (1) because of the failure of the Defendant to make the payments set forth above and because any equity in the property is of

**EXHIBIT 1**
**Page 74 of 100**

inconsequential value.  Plaintiff would urge the Court to terminate, modify or lift the automatic

stay and abandon the subject property from the estate of the Debtor so as to allow the Plaintiff to

pursue all remedies available to it under the terms and conditions of said Deed of Trust, and

applicable state law, including initiation of foreclosure proceedings.  Plaintiff further asks for

attorney fees and court costs incurred.

WHEREFORE, PREMISES CONSIDERED, JPMorgan Chase Bank, National

Association files this Motion and prays that the automatic stay afforded by 11 U.S.C. 362 be

terminated, modified or lifted, after notice and hearing, so as to allow Plaintiff to pursue its

remedies and to initiate foreclosure proceedings against the property which is subject to said

Deed of Trust, and for attorney's fees and costs incurred.

CREDITOR FURTHER REQUESTS that upon entry of an order granting relief from

stay, it be exempted from further compliance with Fed. Rule Bankr.P.3002.1 in the instant

bankruptcy case.

Respectfully submitted
SHAPIRO & MASSEY, LLC


/s/ Laura Henderson-Courtney
　　Laura Henderson-Courtney
　　Attorney for Creditor

EXHIBIT 1
Page 75 of 100

**CERTIFICATE OF SERVICE**

I, Laura Henderson-Courtney, of the firm of Shapiro & Massey, LLC, do hereby certify that I have this date provided a copy of the foregoing Motion for Relief either by electronic case filing or by United States mail postage pre-paid to the following:

Christopher J Steiskal, Sr,
christopher.j.steiskal@usdoj.gov

Craig M. Geno,  Attorney for Debtor
cmgeno@cmgenolaw.com

Office of the U.S. Trustee
USTPRegion05.JA.ECF@usdoj.gov

Joel C Groshong
2335 Sunset Dr.
Forest Grove, OR 97116

Joel C Groshong
2009 Temple Road
Magnolia, MS 39652

Dated: January 30, 2017

Respectfully submitted
SHAPIRO & MASSEY, LLC

/s/ Laura Henderson-Courtney
Laura Henderson-Courtney

Presented by:
J. Gary Massey, MSB#1920
Bradley P. Jones, MSB#9731
Laura Henderson-Courtney, MSB#2266
SHAPIRO & MASSEY, LLC
1080 River Oaks Drive, Suite B-202
Flowood, MS 39232
Telephone No. (601) 981-9299
Facsimile No. (601)981-9762
E-mail:  msbankruptcy@logs.com
BK Case No. 11-02179-KMS

**EXHIBIT 1**
**Page 76 of 100**






# NOTE

January 24, 2002
[Date]

PORTLAND, OR
[City / State]

2335 SUNSET DRIVE, FOREST GROVE, OR  97116
[Property Address]

**1.  BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S. $189,600.00 (this amount is called "Principal"), plus interest, to the order of the Lender.  The Lender is AMERICAN PACIFIC BANK.  I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note.  The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2.  INTEREST**

Interest will be charged on unpaid principal until the full amount of Principal has been paid.  I will pay interest at a yearly rate of 7.000%.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

**3.  PAYMENTS**

(A)  Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the 1st day of each month beginning on March 1, 2002.  I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note.  Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal.  If, on February 1, 2032, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at AMERICAN PACIFIC BANK, 315 SW 5th AVENUE, PORTLAND, OR  97204 or at a different place if required by the Note Holder.

(B)  Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $1,261.41.

**4.  BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due.  A payment of Principal only is known as a "Prepayment."  When I make a Prepayment, I will tell the Note Holder in writing that I am doing so.  I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge.  The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note.  However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note.  If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

**5.  LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me.  The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me.  If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**6.  BORROWER'S FAILURE TO PAY AS REQUIRED**

(A)  Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of 15 calendar days after the date it is due, I will pay a late charge to the Note Holder.  The amount of the charge will be 5.000% of my overdue payment of principal and interest.  I will pay this late charge promptly but only once on each late payment.

(B)  Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

(C)  Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount.  That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

(D)  No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

(E)  Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law.  Those expenses include, for example, reasonable attorneys' fees.

**7.  GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

MULTISTATE FIXED RATE NOTE--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                    Form 3200 1/01

Page 1 of 2

**EXHIBIT 1**
**Page 77 of 100**

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**8. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**9. WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**10. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)
JOEL GROSHONG – Borrower
Social Security Number – 541–60–9343

[Sign Original Only]

WITHOUT RECOURSE PAY TO THE
ORDER OF

WASHINGTON MUTUAL BANK, FA

AMERICAN PACIFIC BANK

_____
JAMES D. HARTY
VICE PRESIDENT

WITHOUT RECOURSE
PAY TO THE ORDER OF

WASHINGTON MUTUAL BANK, FA, successor to
NORTH AMERICAN MORTGAGE COMPANY

BY:_____
MELISSA STEVEN, ASSISTANT SECRETARY

MULTISTATE FIXED RATE NOTE—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3200 1/01
Page 2 of 2



**EXHIBIT 1**
**Page 78 of 100**

RECORDATION REQUESTED BY:
AMERICAN PACIFIC BANK
315 SW 5th AVENUE
PORTLAND, OR 97204

WHEN RECORDED MAIL TO:
AMERICAN PACIFIC BANK
315 SW 5th AVENUE
PORTLAND, OR 97204

Washington County, Oregon   **2002-011000**
01/29/2002 03:43:44 PM
D-M Cnt=1 Stn=16 K GLADDEN
$49.00 $6.00 $11.00 - Total=$57.00

I, Jerry Hanson, Director of Assessment and Taxation and Ex-Officio County Clerk for Washington County, do hereby certify that the written instrument of writing was received and recorded in the book of records of said county.

Jerry R. Hanson, Director of Assessment and Taxation, Ex-Officio County Clerk

[Space Above This Line For Recording Data]

# DEED OF TRUST

**DEFINITIONS**

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A)   "Security Instrument" means this document, which is dated January 24, 2002, together with all Riders to this document.
(B)   "Borrower" is JOEL GROSHONG. Borrower is the trustor under this Security Instrument.
(C)   "Lender" is AMERICAN PACIFIC BANK. Lender is a STATE CHARTERED BANK organized and existing under the laws of the United States of America. Lender's address is 315 SW 5th AVENUE, PORTLAND, OR  97204. Lender is the beneficiary under this Security Instrument.
(D)   "Trustee" is FIRST AMERICAN TITLE COMPANY.
(E)   "Note" means the promissory note signed by Borrower and dated January 24, 2002.  The Note states that Borrower owes Lender One Hundred Eighty-nine Thousand Six Hundred & 00/100 Dollars (U.S. $189,600.00) plus interest.  Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than February 1, 2032.
(F)   "Property" means the property that is described below under the heading "Transfer of Rights in the Property."
(G)   "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.
(H)   "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

☐ Adjustable Rate Rider       ☐ Condominium Rider            ☐ Second Home Rider
☐ Balloon Rider               ☐ Planned Unit Development Rider  ☐ Other(s) [specify] _____
☒ 1–4 Family Rider            ☐ Biweekly Payment Rider

(I)   "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.
(J)   "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.
(K)   "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account.  Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
(L)   "Escrow Items" means those items that are described in Section 3.
(M)   "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.
(N)   "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.
(O)   "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.
(P)   "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. § 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.
(Q)   "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

**TRANSFER OF RIGHTS IN THE PROPERTY**

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note.  For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the County of WASHINGTON:

Real Property tax identification number is R744626.

A parcel of land situated in the William B. Stokes Donation Land Claim No. 61, in Section 31, Township 1 North, Range 3 West, of the Willamette Meridian, in the City of Forest Grove, County of Washington and State of Oregon, more particularly described as follows:

Beginning at the Southeast corner of that parcel conveyed to Eugene D. Revier, et ux, by Deed recorded December 16, 1971 in Book 846, page 826, Film Records of Washington County, Oregon, the said Southeast corner being South 89°33' East 92.35 feet and South 0° 24' West 75 feet from the Intersection of the South line of 24th Avenue and the Easterly line of Sunset Drive; thence North 89°33' West 103.83 feet to a point on the Easterly line of Sunset Drive; thence Southwesterly along the Easterly line of Sunset Drive 125.00 feet, more or less, to the Southwest corner of Lot 8, Block 3, CURTIS ADDITION TO THE CITY OF FOREST GROVE; thence East along the South lines of Lots 8 and 7 of said Block 3, a distance of 130 feet to a point South 0°24' West from the point of beginning; thence North 0°24' East 125.00 feet, more or less, to the point of beginning.

which currently has the address of  2335 SUNSET DRIVE, FOREST GROVE, Oregon 97116  ("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property.  All replacements and additions shall also be covered by this Security Instrument.  All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all

OREGON–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                                     Form 3038 1/01
Page 1 of 6

**EXHIBIT 1**
**Page 79 of 100**

claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non–uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. Application of Payments or Proceeds. Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. Funds for Escrow Items. Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one–time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one–time charge for flood zone determination, certification and tracking services; or (b) a one–time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include

OREGON–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Page 2 of 6

Form 3038 1/01

2002–11000

EXHIBIT 1
Page 80 of 100

a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6.  Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7.  Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8.  Borrower's Loan Application. Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9.  Protection of Lender's Interest in the Property and Rights Under this Security Instrument. If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10.  Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11.  Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction,

OREGON--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Page 3 of 6

2002-11000

Form 3038 1/01

EXHIBIT 1
Page 81 of 100

provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. Joint and Several Liability; Co-signers; Successors and Assigns Bound. Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. Loan Charges. Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. Notices. All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. Governing Law; Severability; Rules of Construction. This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. Borrower's Copy. Borrower shall be given one copy of the Note and of this Security Instrument.

18. Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. Borrower's Right to Reinstate After Acceleration. If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such



2022-11000

**EXHIBIT 1**
**Page 82 of 100**

action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold, and shall cause such notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall give notice of sale in the manner prescribed by Applicable Law to Borrower and to other persons prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

**23. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Such person or persons shall pay any recordation costs. Lender may charge such person or persons a fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Substitute Trustee.** Lender may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

**25. Attorneys' Fees.** As used in this Security Instrument and in the Note, attorneys' fees shall include those awarded by an appellate court.

**26. Protective Advances.** This Security Instrument secures any advances Lender, at its discretion, may make under Section 9 of this Security Instrument to protect Lender's interest in the Property and rights under this Security Instrument.

**27. Required Evidence of Property Insurance.**

WARNING

Unless you provide us with evidence of the insurance coverage as required by our contract or loan agreement, we may purchase insurance at your expense to protect our interest. This insurance may, but need not, also protect your interest. If the collateral becomes damaged, the coverage we purchase may not pay any claim you make or any claim made against you. You may later cancel this coverage by providing evidence that you have obtained property coverage elsewhere.

You are responsible for the cost of any insurance purchased by us. The cost of this insurance may be added to your contract or loan balance. If the cost is added to your contract or loan balance, the interest rate on the underlying contract or loan will apply to this added amount. The effective date of coverage may be the date your prior coverage lapsed or the date you failed to provide proof of coverage.

The coverage we purchase may be considerably more expensive than insurance you can obtain on your own and may not satisfy any need for property damage coverage or any mandatory liability insurance requirements imposed by Applicable Law.

2002-1EX**HIBIT 1**

**Page 83 of 100**

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____

_____ (Seal)

JOEL  GROSHONG – Borrower

——————————————— [Space Below This Line For Acknowledgment] ———————————————

## INDIVIDUAL ACKNOWLEDGMENT

STATE OF OREGON                              )

                                             ) SS
COUNTY OF CLACKAMAS                          )

On this day before me, the undersigned Notary Public, personally appeared JOEL  GROSHONG, to me known to be the individual described in and who executed the Deed of Trust, and acknowledged that he or she signed the Deed of Trust as his or her free and voluntary act and deed, for the uses and purposes therein mentioned.

Given under my hand and official seal this _____ 25TH _____ day of _____ January _____, 20 02.

By _____       Residing at _____ Portland, OR _____

Notary Public in and for the State of _____ OREGON _____       My commission expires _____ 3/16/04 _____

LASER PRO Lending, Ver. 5.18.00.07  Copr. Harland Financial Solutions, Inc. 1997, 2002.  All Rights Reserved.  – OR F:\CFI\LPL\G04.FC  TR-3318  PR-7

·OFFICIAL SEAL
**MARY ANN HUGHES**
NOTARY PUBLIC-OREGON
COMMISSION NO. 332584
MY COMMISSION EXPIRES MAR. 16, 2004

Form 3038 1/01



2002-11000

**EXHIBIT 1**
**Page 84 of 100**

# 1–4 FAMILY RIDER

## (Assignment of Rents)

2002-11000

THIS 1–4 FAMILY RIDER is made this 24th day of January, 2002, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note to AMERICAN PACIFIC BANK (the "Lender") of the same date and covering the Property described in the Security Instrument and located at:

2335 SUNSET DRIVE, FOREST GROVE, OR  97116
[Property Address]

1–4 FAMILY COVENANTS.  In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A.  ADDITIONAL PROPERTY SUBJECT TO THE SECURITY INSTRUMENT.** In addition to the Property described in Security Instrument, the following items now or hereafter attached to the Property to the extent they are fixtures are added to the Property description, and shall also constitute the Property covered by the Security Instrument: building materials, appliances and goods of every nature whatsoever now or hereafter located in, on, or used, or intended to be used in connection with the Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling and attached floor coverings, all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the Property covered by the Security Instrument. All of the foregoing together with the Property described in the Security Instrument (or the leasehold estate if the Security Instrument is on a leasehold) are referred to in this 1–4 Family Rider and the Security Instrument as the "Property."

**B.  USE OF PROPERTY; COMPLIANCE WITH LAW.** Borrower shall not seek, agree to or make a change in the use of the Property or its zoning classification, unless Lender has agreed in writing to the change. Borrower shall comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property.

**C.  SUBORDINATE LIENS.** Except as permitted by federal law, Borrower shall not allow any lien inferior to the Security Instrument to be perfected against the Property without Lender's prior written permission.

**D.  RENT LOSS INSURANCE.** Borrower shall maintain insurance against rent loss in addition to the other hazards for which insurance is required by Section 5.

**E.  "BORROWER'S RIGHT TO REINSTATE" DELETED.** Section 19 is deleted.

**F.  BORROWER'S OCCUPANCY.** Unless Lender and Borrower otherwise agree in writing, Section 6 concerning Borrower's occupancy of the Property is deleted.

**G.  ASSIGNMENT OF LEASES.** Upon Lender's request after default, Borrower shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph G, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

**H.  ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER; LENDER IN POSSESSION.** Borrower absolutely and unconditionally assigns and transfers to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Borrower authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Borrower shall receive the Rents until (i) Lender has given Borrower notice of default pursuant to Section 22 of the Security Instrument, and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notice of default to Borrower: (i) all Rents received by Borrower shall be held by Borrower as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii) Borrower agrees that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorney's fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrower to Lender secured by the Security Instrument pursuant to Section 9.

Borrower represents and warrants that Borrower has not executed any prior assignment of the Rents and has not performed, and will not perform, any act that would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrower. However, Lender or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

**I.  CROSS-DEFAULT PROVISION.** Borrower's default or breach under any note or agreement in which Lender has an interest shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

MULTISTATE 1–4 FAMILY RIDER—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

Form 3170 1/01

EXHIBIT 1
Page 85 of 100

2002-11000

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this 1-4 Family Rider.

_____(Seal)
JOEL  GROSHONG – Borrower

MULTISTATE 1-4 FAMILY RIDER—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

Page 2 of 2

Form 3170 1/01

**EXHIBIT 1**
**Page 86 of 100**

Washington County, Oregon
01/29/2002 03:43:44 PM
D-ASA Cnt=1 Stn=16 K GLADDEN
$5.00 $6.00 $11.00 - Total=$22.00

**2002-011001**

0004246920020011001001012

I, Jerry Hanson, Director of Assessment and Taxation and Ex-Officio County Clerk for Washington County, do hereby certify that the within instrument of writing was received and recorded in the book of records of said county.

Jerry R. Hanson, Director of Assessment and Taxation, Ex-Officio County Clerk

RECORDATION REQUESTED BY:

American Pacific Bank
315 SW 5th Avenue
Portland, OR 97204

WHEN RECORDED MAIL TO:

American Pacific Bank
315 SW 5th Avenue
Portland, OR 97204

_____ [Above This Line For Recording Data] _____

## ASSIGNMENT OF DEED OF TRUST

THIS ASSIGNMENT OF DEED OF TRUST IS DATED JANUARY 24, 2002, BETWEEN AMERICAN PACIFIC BANK (referred to below as "Assignor"), whose address 315 SW 5TH AVENUE, PORTLAND, OR 97204; and WASHINGTON MUTUAL BANK, FA (referred to below as "Assignee"), whose address is 1301 HUDSON LANE, MONROE, LA 71201.

DEED OF TRUST JOEL GROSHONG, the Grantor, executed and granted to FIRST AMERICAN TITLE COMPANY, as Trustee, for the benefit of AMERICAN PACIFIC BANK, the Beneficiary, the following described Deed of Trust dated JANUARY 24, 2002 (the "Deed of Trust") which has been recorded in WASHINGTON County, State of Oregon  real property records as follows:

RECORDED ON _____1/29/02_____

AS FEE/RECORDING NUMBER _____20020011000_____

REAL PROPERTY DESCRIPTION.  The Deed of Trust covers the following described real property (the "Real Property") located in WASHINGTON County, State of Oregon.

A parcel of land situated in the William B. Stokes Donation Land Claim No. 61, in Section 31, Township 1 North, Range 3 West, of the Willamette Meridian, in the City of Forest Grove, County of Washington and State of Oregon, more particularly described as follows:

Beginning at the Southeast corner of that parcel conveyed to Eugene D. Revier, et ux, by Deed recorded December 10, 1971 in Book 846, page 526, Film Records of Washington County, Oregon, the said Southeast corner being South 89° 33' East 92.35 feet and South 0° 24' West 75 feet from the intersection of the South line of 24th Avenue and the Easterly line of Sunset Drive; thence North 89° 33' West 103.83 feet to a point on the Easterly line of Sunset Drive; thence Southwesterly along the Easterly line of Sunset Drive 125.00 feet, more or less, to the Southwest corner of Lot 8, Block 3, CURTIS ADDITION TO THE CITY OF FOREST GROVE; thence East along the South lines of Lots 8 and 7 of said Block 3, a distance of 130 feet to a point South 0° 24' West from the point of beginning; thence North 0° 24' East 125.00 feet, more or less, to the point of beginning.

The Real Property or its address is commonly known as 2335 SUNSET DRIVE, FOREST GROVE, OREGON  97116 .

ASSIGNMENT OF DEED OF TRUST.  For valuable consideration, Assignor hereby assigns and conveys to Assignee all of Assignor's right, title, and interest in and to the above described Deed of Trust, together with all of Assignor's right, title and interest in and to the promissory note or notes (or other credit agreements) secured by the Deed of Trust.

IN WITNESS WHEREOF, ASSIGNOR HAS EXECUTED THIS ASSIGNMENT OF DEED OF TRUST AS OF JANUARY 24, 2002.

ASSIGNOR:

AMERICAN PACIFIC BANK

By: _____
    JAMES D. HARTY, VICE-PRESIDENT

### CORPORATE ACKNOWLEDGMENT

STATE OF _____OREGON_____ )
                                        ) ss
COUNTY OF _____MULTNOMAH_____ )

On this __24TH__ day of __JANUARY_____, 2002, before me, the undersigned Notary Public, personally appeared JAMES D. HARTY, of AMERICAN PACIFIC BANK, and known to me to be an authorized agent of the corporation that executed the Assignment of Deed of Trust and acknowledged the Assignment to be the free and voluntary act and deed of the corporation, by authority of its Bylaws or by resolution of its board of directors, for the uses and purposes therein mentioned, and on oath stated that he or she is authorized to execute this Assignment and in fact executed the Assignment on behalf of the corporation.

By _____     Residing at _____SCAPPOOSE_____
Notary Public in and for the State of _____OREGON_____     My commission expires _____

OFFICIAL SEAL
PAUL WRIGHT
NOTARY PUBLIC - OREGON
COMMISSION NO. 335778
MY COMMISSION EXPIRES JUNE 28, 2004

**EXHIBIT 1**
**Page 87 of 100**

| Washington County, Oregon | **2013-022953** |
|---|---|
| D-MA | 03/14/2013 08:35:02 AM |
| Stn=19 Y LOPEZ | |
| $5.00 $11.00 $5.00 $15.00 | **$36.00** |

I, Richard Hobernicht, Director of Assessment and Taxation and Ex-Officio County Clerk for Washington County, Oregon, do hereby certify that the within instrument of writing was received and recorded in the book of records of said county.

Richard Hobernicht, Director of
Assessment and Taxation, Ex-Officio

When Recorded Return To:
JPMorgan Chase Bank, NA
C/O NTC 2100 Alt, 19 North
Palm Harbor, FL 34683
Loan #: ▮▮▮▮▮▮

## CORPORATE ASSIGNMENT OF DEED OF TRUST

Contact JPMORGAN CHASE BANK, N.A. for this instrument 780 Kansas Lane, Suite A, Monroe, LA 71203, telephone # (866) 756-8747, which is responsible for receiving payments.
FOR GOOD AND VALUABLE CONSIDERATION, the sufficiency of which is hereby acknowledged, the undersigned, FEDERAL DEPOSIT INSURANCE CORPORATION, AS RECEIVER OF WASHINGTON MUTUAL BANK F/K/A WASHINGTON MUTUAL BANK, FA, WHOSE ADDRESS IS 780 Kansas Lane, MC 8000, MONROE, LA, 71203, (ASSIGNOR), by these presents does convey, grant, assign, transfer and set over the described Deed of Trust with all interest secured thereby, all liens, and any rights due or to become due thereon to JPMORGAN CHASE BANK, NATIONAL ASSOCIATION, WHOSE ADDRESS IS 780 Kansas Lane, MC 8000, MONROE, LA 71203 (866)756-8747, ITS SUCCESSORS OR ASSIGNS, (ASSIGNEE).

Said Deed of Trust dated 01/24/2002, and executed by JOEL GROSHONG whose address is 2335 SUNSET DRIVE, FOREST GROVE, OR 97116 to AMERICAN PACIFIC BANK and recorded on 01/29/2002 in Book n/a, Page n/a, as Instrument # 2002-011000 in the office of the Recorder of WASHINGTON County, Oregon.

This Assignment is made without recourse, representation or warranty, express or implied, by the FDIC in its corporate capacity or as Receiver.

This Assignment is intended to further memorialize the transfer that occured by operation of law on September 25, 2008 as authorized by Section 11(d)(2)(G)(i)(II) of the Federal Deposit Insurance Act, 12 U.S.C. S1821 (d)(2)(G)(i)(II)

IN WITNESS WHEREOF, this Assignment is executed on 03 / 08 /2013 (MM/DD/YYYY)
FEDERAL DEPOSIT INSURANCE CORPORATION, AS RECEIVER OF WASHINGTON MUTUAL BANK F/K/A WASHINGTON MUTUAL BANK, FA, by JPMORGAN CHASE BANK, NATIONAL ASSOCIATION, Its Attorney-In-Fact

By: _Katashe Gilbert_
VICE PRESIDENT

STATE OF LOUISIANA   PARISH OF OUACHITA
On 03 / 08 /2013 (MM/DD/YYYY), before me appeared _Katasha Gilbert_, to me personally known, who did say that he/she/they is/are the VICE PRESIDENT of JPMORGAN CHASE BANK, NATIONAL ASSOCIATION as Attorney-In-Fact for FEDERAL DEPOSIT INSURANCE CORPORATION, AS RECEIVER OF WASHINGTON MUTUAL BANK F/K/A WASHINGTON MUTUAL BANK. FA and that the instrument was signed on behalf of the corporation (or association), by authority from its board of directors, and that he/she/they acknowledged the instrument to be the free act and deed of the corporation (or association).

_Y. K. Wilson_
Notary Public - State of LOUISIANA
Commission expires: Upon My Death

Y. K. WILSON
OUACHITA PARISH, LOUISIANA
LIFETIME COMMISSION
NOTARY ID# 094559

Prepared By: E.Lance/NTC, 2100 Alt. 19 North, Palm Harbor, FL 34683 (800)346-9152

**EXHIBIT 1**
**Page 88 of 100**

EXHIBIT 1
Page 89 of 100

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION**

IN RE:                                                                    CHAPTER 11 PROCEEDING
JOEL C GROSHONG, DEBTOR                                    CASE NO. 11-02179-KMS

JPMORGAN CHASE BANK, NATIONAL ASSOCIATION                          PLAINTIFF

VS.

JOEL C GROSHONG                                                          DEFENDANT

<u>ORDER GRANTING RELIEF FROM AUTOMATIC STAY</u>
<u>DOCKET NO.              </u>

THIS CAUSE came on for consideration on the motion to lift automatic stay filed by

JPMorgan Chase Bank, National Association, and the Court finds that the Defendant, Joel C

Groshong, failed to respond to plaintiff's Motion and being fully advised in the premises finds

the Motion well taken.

IT IS ORDERED AND ADJUDGED that the Automatic Stay provided for in 11 U.S.C.

362 be modified to allow JPMorgan Chase Bank, National Association to pursue all remedies

against the property available to it under the terms and conditions of said deed of trust and

applicable state law against Defendant's property described as follows:

**EXHIBIT 1
Page 90 of 100**

A parcel of land situated in the William B. Stokes Donation Land Claim No. 61, in Section 31, Township1 North, Range 3 West, of the Williamettie Meridian, in the City of Forest Grove, County of Washington and State of Oregon, more particularly described as follows:

Beginning at the Southeast corner of that parcel conveyed to Eugene D. Revier, et ux, by Deed recorded December 10, 1971 Book 846, Page 526. Film Records, in the County of Washington and State of Oregon, the said Southeast corner being South 89 degrees 33 minutes East 92.35 feet and South 00 degrees 24 minutes West 75 feet from the intersection of the South line of 24th Avenue and the Easterly line of Sunset Drive; thence Southwesterly  along the Easterly line of Sunset Drive 125.00 feet, more or less to the Southwest corner of Lot 8, Block 3 of CURTIS ADDITION TO THE CITY OF FOREST GROVE; thence East along the South lines of Lots 8 and 7 of said Block 3 a distance of 130 feet to a point South 00 degrees 24 minutes West from the point of beginning; thence North 00 degrees 24 minutes East 125.00 feet, more or less. to the point of beginning.

and being subject to that Deed of Trust recorded in the office of the Washington County Chancery Clerk's office in Instrument No. 2002-011000.  Entry of this order shall constitute the entry of a final judgment pursuant to Bankruptcy Rule 9021 and Rule 58 of the Federal Rules of Civil Procedure and shall be applicable to any subsequent Debtor conversion of this case to any other Chapter under the Bankruptcy Code.

IT IS FURTHER ORDERED AND ADJUDGED that the Trustee shall abandon the hereinabove described property from the estate pursuant to 11 U.S.C. §554(b).

**##END OF ORDER##**

Presented by:
J. Gary Massey, MSB#1920
Bradley P. Jones, MSB#9731
Laura Henderson-Courtney, MSB#2266
SHAPIRO & MASSEY, LLC
1080 River Oaks Drive, Suite B-202
Flowood, MS 39232
Telephone No. (601) 981-9299
Facsimile No. (601)981-9762
E-mail:  msbankruptcy@logs.com
BK Case No. 11-02179-KMS

**EXHIBIT 1**
**Page 91 of 100**

August 22, 2017

## NOTICE OF ASSIGNMENT, SALE OR TRANSFER OF OWNERSHIP OF MORTGAGE LOAN (15 U.S.C. § 1641(g))

You are receiving this notice because the ownership of your mortgage loan identified below has been sold, assigned, or transferred to MTGLQ Investors, L.P. ("Covered Person"). You may contact the prior holder of your mortgage loan, or the servicer of your mortgage loan, if you want to confirm the sale/assignment/transfer of your mortgage loan to the new Covered Person.

Information about your Mortgage Loan:

Borrower Name(s): JOEL GROSHONG
Chase Loan Number: 8464645145
Address of Mortgaged Property: 2335 SUNSET DR FOREST GROVE, OR 97116

*Please note the following information regarding the sale/assignment/transfer of your mortgage loan*:

1. Name, address and telephone number of the new Covered Person:
   MTGLQ Investors, L.P., 6011 Connection Drive, Irving TX, 75039  (866) 707-8234

2. Date of sale/assignment/transfer of your mortgage loan: July 26, 2017

3. How to reach your Mortgage Loan Servicer, which is the party who has authority to act on behalf of the new Covered Person:

   MTGLQ Investors, L.P. does not service your loan. The current servicer of your loan is Chase (your "Mortgage Loan Servicer"). Your Mortgage Loan Servicer is responsible for the ongoing administration of your mortgage loan, including collecting mortgage payments, sending billing statements and escrow statements and answering any questions you may have about your mortgage loan.

   **MTGLQ INVESTORS, L.P. IS NOT THE SERVICER OF YOUR LOAN.  ANY MORTGAGE PAYMENTS SHOULD CONTINUE TO BE SENT TO YOUR MORTGAGE SERVICER. SHOULD YOU HAVE ANY QUESTIONS REGARDING YOUR LOAN, PLEASE CONTACT THE SERVICER USING THE CONTACT INFORMATION SET FORTH BELOW.**

   The mailing address and phone number of the Mortgage Loan Servicer for your mortgage loan is:

   PO Box 78420
   Phoenix, AZ 85062-8116
   1-866-233-3175
   8:00 a.m. - Midnight (ET) Monday – Friday
   8:00 a.m. - 8:00 p.m. (ET) Saturday

4. The location of the place where transfer of ownership of the debt is or may be recorded is the office of public land records or the recorder of deeds office for the county or local jurisdiction where the property is located.

**EXHIBIT 1**
**Page 92 of 100**

MTGLQ Investors, LP
Bowling Green Station
PO Box 1110
NY, NY 10274

JOEL GROSHONG
2009 TEMPLE RD
MAGNOLIA, MS 39652

EXHIBIT 1
Page 93 of 100

**Chase**
P.O. Box 183210
Columbus, OH 43218-3210

# CHASE ⬡

**Notice of Assignment, Sale or
Transfer of Servicing Rights**

8/17/2017

*NOW
RoSHmore*

ıllıllılıuılıllılılıuıllılılılıllıılllıuıllılılllılıuıllıl
001334 - 1 of 3 NSP0BYE0-Z1 J8890107 10000000000
JOEL GROSHONG
2009 TEMPLE RD
MAGNOLIA, MS 39652-8004

**Your mortgage loan will be serviced by Rushmore, starting 9/1/2017**

**Chase loan number: 8464645145**    *⊃ 2335 SonSet*
**New servicer loan number: 7601085025**

Dear Joel Groshong:

We're writing to let you know that the servicing of your mortgage loan will transfer from JPMorgan Chase Bank, N.A. (Chase) to Rushmore Loan Management Services LLC (Rushmore), effective 9/1/2017.

Your new servicer will:

- Collect and process your payments.
- Send account statements and annual tax forms.
- Notify you of account-related issues and updates.

This transfer doesn't affect any of the terms of your loan, other than the terms directly related to the servicing of your loan.

**Here's what this means to you**
On or after 9/1/2017:

- Your account number will change. Rushmore will send you a letter with your new account number.
- You'll send your mortgage payments to your new servicer, which will begin accepting them. We'll no longer accept your payments after this date.
- You'll contact your new servicer for questions about your account.

**EXHIBIT 1**
**Page 94 of 100**

5. Partial Payments:

MTGLQ Investors, L.P. is your new lender and may have a different Partial Payment Policy than your previous lender. Under our policy, we may hold payments that are less than the amount due (partial payments) in a separate account until you pay the rest of the payment, and then apply the full payment to your loan. If this loan is sold, your new lender may have a different policy.

6. Additional information:

The transfer of ownership of your loan does not affect any term or condition of your mortgage loan, other than terms directly related to the ownership of your loan.

This notice does not change the address where you send your mortgage loan payments. Any payments should be sent to your Mortgage Loan Servicer, as noted above.

**This notice is not an attempt to collect, assess or recover a claim against you, or to obtain possession or control of any property.**

**EXHIBIT 1**
**Page 95 of 100**

JLF 22-127672

# TRUSTEE'S NOTICE OF SALE

A default has occurred under the terms of a trust deed made by Joel Groshong, whose address is 2335 Sunset Drive, Forest Grove, OR 97116 as grantor to First American Title Company, as Trustee, in favor of American Pacific Bank, as named Beneficiary, dated January 24, 2002, recorded January 29, 2002, in the mortgage records of Washington County, Oregon, as Recorder's Fee No. 2002-011000, MTGLQ Investors, LP is the present Beneficiary as defined by ORS 86.705(2), as covering the following described real property:

A PARCEL OF LAND SITUATED IN THE WILLIAM B. STOKES DONATION LAND CLAIM NO. 61, IN SECTION 31, TOWNSHIP 1 NORTH, RANGE 3 WEST, OF THE WILLAMETTE MERIDIAN, IN THE CITY OF FOREST GROVE, COUNTY OF WASHINGTON AND STATE OF OREGON, MORE PARTICULARLY DESCRIBED AS FOLLOWS: BEGINNING AT THE SOUTHEAST CORNER OF THAT PARCEL CONVEYED TO EUGENE D. REVIER, ET UX, BY DEED RECORDED DECEMBER 10, 1971, IN BOOK 846, PAGE 526, FILM RECORDS, OF WASHINGTON COUNTY, OREGON, THE SAID SOUTHEAST CORNER BEING SOUTH 89°33' EAST 92.35 FEET AND SOUTH 0°24' WEST 75 FEET FROM THE INTERSECTION OF THE SOUTH LINE OF 24TH AVENUE AND THE EASTERLY LINE OF SUNSET DRIVE; THENCE NORTH 89°33' WEST 103.83 FEET TO A POINT ON THE EASTERLY LINE OF SUNSET DRIVE; THENCE SOUTHWESTERLY ALONG THE EASTERLY LINE OF SUNSET DRIVE 125.00 FEET, MORE OR LESS, TO THE SOUTHWEST CORNER OF LOT 8, BLOCK 3, CURTIS ADDITION TO THE CITY OF FOREST GROVE, THENCE EAST ALONG THE SOUTH LINES OF LOTS 8 AND 7 OF SAID BLOCK 3, A DISTANCE OF 130 FEET TO A POINT SOUTH 0°24' WEST FROM THE POINT OF BEGINNING; THENCE NORTH 0°24' EAST 125.00 FEET, MORE OR LESS, TO THE POINT OF BEGINNING.

**COMMONLY KNOWN AS:** 2335 Sunset Drive, Forest Grove, OR 97116

Both the beneficiary and the trustee have elected to sell the said real property to satisfy the obligations secured by said trust deed and a notice of default has been recorded pursuant to Oregon Revised Statutes 86.752(3); the default for which the foreclosure is made is grantor's failure to pay when due the following sums:

Delinquent Monthly payments from September 1, 2015 in the sum of $120,693.10, and monthly payments in the amount of $1,002.89 from September 1, 2022, plus prior accrued late charges in the amount of $100.28, plus the sum of $11,089.54 for advances, together with all costs, disbursements, and/or fees incurred or paid by the beneficiary and/or trustee, their employees, agents or assigns.

**EXHIBIT 1**
**Page 96 of 100**

By reason of said default the beneficiary has declared all sums owing on the obligation that the trust deed secures immediately due and payable, said sum being the following, to-wit:

$187,764.10, together with accrued interest in the sum of $50,956.02 through August 18, 2022, together with interest thereon at the rate of 4% per annum from August 19, 2022, plus prior accrued late charges in the amount of $100.28, plus the sum of $42,712.60 for advances, together with all costs, disbursements, and/or fees incurred or paid by the beneficiary and/or trustee, their employees, agents or assigns.

WHEREFORE, notice hereby is given that the undersigned trustee will on January 4, 2023, at the hour of 11:00 AM PT, in accord with the standard time established by ORS 187.110, on the steps of the 2nd Avenue entrance of the Washington County Courthouse, located at 145 N.E. 2nd Avenue, in the City of Hillsboro, OR, County of Washington, State of Oregon, sell at public auction to the highest bidder for cash the interest in the said described real property which the grantor has or had power to convey at the time of the execution of said trust deed, together with any interest which the grantor or his successors in interest acquired after the execution of said trust deed, to satisfy the foregoing obligations thereby secured and the costs and expenses of sale, including a reasonable charge by the trustee. Notice is further given to any person named in ORS 86.778 that the right exists, at any time that is not later than five days before the date last set for the sale, to have this foreclosure proceeding dismissed and the trust deed reinstated by paying to the beneficiary of the entire amount due (other than such portion of the principal as would not then be due had no default occurred) and by curing any other default complained of herein that is capable of being cured by tendering the performance required under the obligations or trust deed, and in addition to paying said sums or tendering the performance necessary to cure the default, by paying all costs and expenses actually incurred in enforcing the obligation and trust deed, together with trustee's fees and attorney's fees not exceeding the amounts provided by said ORS 86.778.

Notice is further given that reinstatement or payoff quotes requested pursuant to ORS 86.786 and ORS 86.789 must be timely communicated in a written request that complies with that statute, addressed to the trustee's "Reinstatements/Payoffs – ORS 86.786" either by personal delivery or by first class, certified mail, return receipt requested, to the trustee's address shown below. Due to potential conflicts with federal law, persons having no record legal or equitable interest in the subject property will only receive information concerning the lender's estimated or actual bid. Lender bid information is also available at the trustee's website, www.logs.com/janeway_law_firm.

In construing this notice, the masculine gender includes the feminine and the neuter, the singular includes the plural, the word "grantor" includes any successor in interest to the grantor as well as any other person owing an obligation, the performance of which is secured by said trust deed, and the words "trustee" and "beneficiary" include their respective successors in interest, if any.

Also, please be advised that pursuant to the terms stated on the Deed of Trust and Note, the beneficiary is allowed to conduct property inspections while property is in default. This shall serve as notice that the beneficiary shall be conducting property inspections on the said referenced property.

**EXHIBIT 1**
**Page 97 of 100**

Without limiting the trustee's disclaimer of representations or warranties, Oregon law requires the trustee to state in this notice that some residential property sold at a trustee's sale may have been used in manufacturing methamphetamines, the chemical components of which are known to be toxic. Prospective purchasers of residential property should be aware of this potential danger before deciding to place a bid for this property at the trustee's sale.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### NOTICE TO RESIDENTIAL TENANTS

The property in which you are living is in foreclosure. A foreclosure sale is scheduled for January 4, 2023. The date of this sale may be postponed. Unless the lender that is foreclosing on this property is paid before the sale date, the foreclosure will go through and someone new will own this property. After the sale, the new owner is required to provide you with contact information and notice that the sale took place.

The following information applies to you only if you are a bona fide tenant occupying and renting this property as a residential dwelling under a legitimate rental agreement. The information does not apply to you if you own this property or if you are not a bona fide residential tenant.

If the foreclosure sale goes through, the new owner will have the right to require you to move out. Before the new owner can require you to move, the new owner must provide you with written notice that specifies the date by which you must move out. If you do not leave before the move-out date, the new owner can have the sheriff remove you from the property after a court hearing. You will receive notice of the court hearing.

### PROTECTION FROM EVICTION

IF YOU ARE A BONA FIDE TENANT OCCUPYING AND RENTING THIS PROPERTY AS A RESIDENTIAL DWELLING, YOU HAVE THE RIGHT TO CONTINUE LIVING IN THIS PROPERTY AFTER THE FORECLOSURE SALE FOR:

- 60 DAYS FROM THE DATE YOU ARE GIVEN A WRITTEN TERMINATION NOTICE, IF YOU HAVE A FIXED TERM LEASE; OR

- AT LEAST 30 DAYS FROM THE DATE YOU ARE GIVEN A WRITTEN TERMINATION NOTICE, IF YOU HAVE A MONTH-TO-MONTH OR WEEK-TO-WEEK RENTAL AGREEMENT.

If the new owner wants to move in and use this property as a primary residence, the new owner can give you written notice and require you to move out after 30 days, even though you have a fixed term lease with more than 30 days left.

You must be provided with at least 30 days' written notice after the foreclosure sale before you can be required to move.

**EXHIBIT 1**
**Page 98 of 100**

A bona fide tenant is a residential tenant who is not the borrower (property owner) or a child, spouse or parent of the borrower, and whose rental agreement:

- Is the result of an arm's-length transaction;

- Requires the payment of rent that is not substantially less than fair market rent for the property, unless the rent is reduced or subsidized due to a federal, state or local subsidy; and

- Was entered into prior to the date of the foreclosure sale.

## ABOUT YOUR TENANCY BETWEEN NOW AND THE FORECLOSURE SALE:

RENT

YOU SHOULD CONTINUE TO PAY RENT TO YOUR LANDLORD UNTIL THE PROPERTY IS SOLD OR UNTIL A COURT TELLS YOU OTHERWISE. IF YOU DO NOT PAY RENT, YOU CAN BE EVICTED. BE SURE TO KEEP PROOF OF ANY PAYMENTS YOU MAKE.

SECURITY DEPOSIT

You may apply your security deposit and any rent you paid in advance against the current rent you owe your landlord as provided in ORS 90.367. To do this, you must notify your landlord in writing that you want to subtract the amount of your security deposit or prepaid rent from your rent payment. You may do this only for the rent you owe your current landlord. If you do this, you must do so before the foreclosure sale. The business or individual who buys this property at the foreclosure sale is not responsible to you for any deposit or prepaid rent you paid to your landlord.

ABOUT YOUR TENANCY AFTER THE FORECLOSURE SALE

The new owner that buys this property at the foreclosure sale may be willing to allow you to stay as a tenant instead of requiring you to move out after 30 or 60 days. After the sale, you should receive a written notice informing you that the sale took place and giving you the new owner's name and contact information. You should contact the new owner if you would like to stay. If the new owner accepts rent from you, signs a new residential rental agreement with you or does not notify you in writing within 30 days after the date of the foreclosure sale that you must move out, the new owner becomes your new landlord and must maintain the property. Otherwise:

- You do not owe rent;
- The new owner is not your landlord and is not responsible for maintaining the property on your behalf; and
- You must move out by the date the new owner specifies in a notice to you.

**EXHIBIT 1**
**Page 99 of 100**

The new owner may offer to pay your moving expenses and any other costs or amounts you and the new owner agree on in exchange for your agreement to leave the premises in less than 30 or 60 days. You should speak with a lawyer to fully understand your rights before making any decisions regarding your tenancy.

IT IS UNLAWFUL FOR ANY PERSON TO TRY TO FORCE YOU TO LEAVE YOUR DWELLING UNIT WITHOUT FIRST GIVING YOU WRITTEN NOTICE AND GOING TO COURT TO EVICT YOU. FOR MORE INFORMATION ABOUT YOUR RIGHTS, YOU SHOULD CONSULT A LAWYER. If you believe you need legal assistance, contact the Oregon State Bar and ask for the lawyer referral service. Contact information for the Oregon State Bar is included with this notice. If you do not have enough money to pay a lawyer and are otherwise eligible, you may be able to receive legal assistance for free. Information about whom to contact for free legal assistance is included with this notice.

OREGON STATE BAR, 16037 S.W. Upper Boones Ferry Road, Tigard, Oregon 97224, Phone (503) 620-0222, Toll-free 1-800-452-8260 Website:   http://www.osbar.org

Directory of Legal Aid Programs:   http://www.oregonlawhelp.org

*********************************************************************************************

The Fair Debt Collection Practice Act requires that we state the following:  This is an attempt to collect a debt, and any information obtained will be used for that purpose.  If a discharge has been obtained by any party through bankruptcy proceedings:  This shall not be construed to be an attempt to collect the outstanding indebtedness or hold you personally liable for the debt.

     The Successor Trustee, Janeway Law Firm, LLC, has authorized the undersigned Attorney to execute the document on the Successor Trustee's behalf as allowed under ORS 86.713(9).

Dated: _8/26/2022_                    By: _____

                                  OSB# _____
                                  JANEWAY LAW FIRM, LLC,
                                  Successor Trustee
                                  1499 SE Tech Center Place, Suite 255
                                  Vancouver, WA 98683
                                  www.logs.com/janeway_law_firm
                                  Telephone: (360) 260-2253
                                  Toll-free: 1-800-970-5647
                                  JLF 22-127672

     I, the undersigned certify that the foregoing instrument is a complete and exact copy of the original Trustee's Notice of Sale

EXHIBIT 1
Page 100 of 100